# United States Court of Appeals
## For the First Circuit

No. 08-2310

ELEANOR MCCULLEN ET AL.,

Plaintiffs, Appellants,

v.

MARTHA COAKLEY, ATTORNEY GENERAL FOR THE COMMONWEALTH
OF MASSACHUSETTS,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Howard, Selya and Hansen,[*]
Circuit Judges.

Michael J. DePrimo, with whom Philip D. Moran, Philip D. Moran P.C., Benjamin W. Bull, and Alliance Defense Fund were on brief, for appellants.
Dwight G. Duncan and Colbe Mazzarella on brief for Marlynda Augelli, Susanna Brennan, Cynthia Brown, Magdalena Castro, Alveda King, Anita Manninen, Esther Ripplinger, and Molly White, amici curiae.
Kenneth W. Salinger, Assistant Attorney General, with whom Martha Coakley, Attorney General, and Anna-Marie Tabor, Assistant Attorney General, were on brief, for appellee.

---

[*]Of the Eighth Circuit, sitting by designation.

Robert E. McDonnell, Laura K. Langley, Josephine Deang, and Bingham McCutchen LLP on brief for American Civil Liberties Union of Mass., amicus curiae.

_____

July 8, 2009

_____

**SELYA**, **Circuit Judge**. For more than three decades, those who advocate for a woman's right to choose and those who advocate for the right to life (based on a belief that life begins at the moment of conception) have struggled for advantage in the marketplace of ideas. A series of pitched battles, forming a part of this struggle, has been waged at free-standing abortion clinics, where protestors and anti-abortion counselors seek to dissuade prospective patients, shame clinic workers, and call attention to what they perceive as the evils of voluntary terminations of pregnancies. In this campaign Massachusetts has been a battleground state.

This appeal arises out of yet another skirmish in this chronicle of discord. In a very real sense, genesis of the appeal dates back to the dawning of the millennium. At that time, the Massachusetts legislature enacted a statute that created a floating buffer zone around the entrances, exits, and driveways of abortion clinics throughout the state.[1]

Given the benefit of hindsight, the legislature revised the law seven years later. The modified version of the statute replaced the floating buffer zone with a 35-foot fixed buffer zone.

---

[1] The mechanics of the 2000 Act and the dimensions of the then-current buffer zone are described in earlier opinions of this court. See McGuire v. Reilly, 386 F.3d 45, 49 (1st Cir. 2004); McGuire v. Reilly, 260 F.3d 36, 40 (1st Cir. 2001).

-2-

This appeal involves a multi-pronged facial challenge to the constitutionality of the modified statute.

In a thoughtful and comprehensive opinion, the district court rejected the facial challenge in all its iterations and refused to enjoin enforcement of the new law. McCullen v. Coakley, 573 F. Supp. 2d 382 (D. Mass. 2008). After careful consideration of the record, the parties' briefs, some helpful friend-of-the-court briefs, and the arguments made orally, we affirm.

I.   BACKGROUND

In this case, as in so many cases, the past informs the present. We start there.

By the end of the twentieth century, Massachusetts had experienced repeated incidents involving violence and other unduly aggressive behaviors in the vicinity of reproductive health care facilities (RHCFs). Choosing among a host of possible preventive measures, the legislature took up a bill that proposed creating a fixed 25-foot buffer zone around the entrances, exits, and driveways of RHCFs.

The state senate held a hearing on the bill in April 1999 and received evidence of widespread harassment and intimidation outside RHCFs. Numerous witnesses addressed not only the peculiar vulnerability of women seeking abortion services but also the deleterious effects of overly aggressive demonstrations on both patient and provider safety. The senate concluded that existing

laws did not adequately safeguard clinic staff, prospective patients, or members of the public.

As part of its due diligence, the senate asked the Massachusetts Supreme Judicial Court (SJC) for an advisory opinion on the constitutionality of the proposed law. The SJC discerned no constitutional impediment. Opinion of the Justices to the Senate, 723 N.E.2d 1, 6 (Mass. 2000).

The senate subsequently engrossed a bill intended to enhance public safety in and around RHCFs while maintaining the relatively free flow of traffic. See Mass. S. Jour., Feb. 29, 2000. That bill resembled the original senate bill.

Before the house of representatives could act on the senate bill, the United States Supreme Court decided Hill v. Colorado, in which the Justices upheld, as a content-neutral time, place, and manner restriction, a Colorado statute designed to ameliorate the same panoply of evils through the use of a floating buffer zone. 530 U.S. 703, 707-08 (2000). The Colorado statute synthesized the fixed and floating buffer zone concepts, making it unlawful within a 100-foot fixed zone for any person, in the absence of consent, to "knowingly approach" within eight feet of another person "for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person." Id. at 707 (quoting Colo. Rev. Stat. § 18-9-122(3)).

-4-

The Massachusetts legislature recognized that <u>Hill</u> had shed new light on the legal landscape. Thus, the house tabled the senate bill and repaired to the drawing board. The legislature eventually enacted a law that was loosely patterned on the Colorado statute. <u>See</u> An Act Relative to Reproductive Health Care Facilities (2000 Act), S.B. 148, 181st Gen. Ct. (Mass. Aug. 10, 2000). The key component of the 2000 Act was a prohibition against knowingly approaching within six feet of another without consent for certain defined protest-related purposes. Because the prohibition only operated within an 18-foot fixed buffer zone around RHCF entrances, exits, and driveways, it mimicked the Colorado law in combining floating and fixed buffer zone concepts.

A group of Massachusetts residents who wished to protest in front of RHCFs mounted both facial and as-applied challenges to the constitutionality of the new enactment. In successive decisions, we rejected those challenges. <u>See</u> <u>McGuire</u> v. <u>Reilly</u> (<u>McGuire I</u>), 260 F.3d 36, 51 (1st Cir. 2001) (rejecting facial challenges); <u>McGuire</u> v. <u>Reilly</u> (<u>McGuire II</u>), 386 F.3d 45, 65-66 (1st Cir. 2004) (rejecting renewed facial challenges as well as as-applied challenges).

Over time, legislators became concerned that the statute had failed to achieve its desired goals. In 2007, the legislature held public hearings devoted to the need for rewriting the statute. Testimony (including statements from law enforcement officials and

clinic workers) revealed unanticipated difficulties in enforcing the 2000 Act and called into question that Act's efficacy. The upshot was a decision to reshape the law by, among other things, repudiating the floating buffer zone concept and relying instead on a 35-foot fixed buffer zone.

On November 8, 2007, the legislature enacted the revised law. See An Act Relative to Public Safety at Reproductive Health Care Facilities (2007 Act), S.B. 1353, 185th Gen. Ct. (Mass. Nov. 13, 2007). It declares that "[n]o person shall knowingly enter or remain on a public way or sidewalk adjacent to [an RHCF]" within a designated buffer zone. Mass. Gen. Laws ch. 266, § 120E 1/2(b) (2007). The Act describes the new buffer zone as comprising

> a radius of 35 feet of any portion of an entrance, exit or driveway of a reproductive health care facility or within the area within a rectangle created by extending the outside boundaries of any entrance, exit or driveway of a reproductive health care facility in straight lines to the point where such lines intersect the sidelines of the street in front of such entrance, exit or driveway.

Id. Moreover, the law prohibits all persons from entering or remaining within the buffer zone during ordinary business hours, subject to exceptions for four classes of persons, namely:

> (1) persons entering or leaving such facility;
>
> (2) employees or agents of such facility acting within the scope of their employment;
>
> (3) law enforcement, ambulance, firefighting, construction, utilities, public works and other

> municipal agents acting within the scope of
> their employment; and
>
> (4) persons using the public sidewalk or street
> right-of-way adjacent to such facility solely
> for the purpose of reaching a destination other
> than such facility.

Id. Each of these exceptions derives from the 2000 Act. And the 2007 Act, like the 2000 Act, also requires that the buffer zone be clearly marked. See id.

On January 25, 2008, the Attorney General sent a letter to an audience that included law enforcement and RHCF personnel. The letter purports to summarize the provisions of the 2007 Act and to furnish "guidance to assist . . . in applying the four exemptions." This guidance comprises four paragraphs, set forth verbatim in an appendix to this opinion.

## II. TRAVEL OF THE CASE

On January 16, 2008, plaintiffs-appellants Eleanor McCullen, Jean Blackburn Zarrella, Gregory A. Smith, Carmel Farrell, and Eric Caden, all Massachusetts residents who regularly engage in pro-life counseling outside RHCFs, sued the Attorney General of Massachusetts, in her representative capacity, in the federal district court. Their complaint invoked 42 U.S.C. § 1983, limned a constellation of constitutional claims, and prayed for declaratory and injunctive relief aimed at derailing the 2007 Act. Without objection, the district court bifurcated the case into facial and as-applied challenges. As to the former, the court consolidated the

-7-

preliminary injunction hearing with the hearing on the merits, see Fed. R. Civ. P. 65(a)(2), and began a bench trial on May 28, 2008.

In due season, the court issued a decision denying relief. McCullen, 573 F. Supp. 2d at 425. This interlocutory appeal followed. We have jurisdiction under 28 U.S.C. § 1292(a)(1).

## III. ANALYSIS

We begin our odyssey by outlining the legal standards that apply generally to facial challenges and then proceed to the myriad prongs of the plaintiffs' facial challenge. Because the issues raised on appeal implicate the First Amendment, they engender de novo review. See Bose Corp. v. Consumers Union, 466 U.S. 485, 508 (1984).

### A. General Standards.

Around the edges, the standards that apply in evaluating facial challenges to the constitutionality of statutes are not entirely clear. See Richard H. Fallon, Jr., Commentary, As-applied and Facial Challenges and Third-Party Standing, 113 Harv. L. Rev. 1321, 1322-23 (2000). For present purposes, though, the path is reasonably well-lighted.

The Supreme Court recently has stated that a facial challenge will fail if a statute "has a plainly legitimate sweep." Wash. State Grange v. Wash. State Repub. Party, 128 S. Ct. 1184, 1190 (2008) (citation and internal quotation marks omitted). This is a refinement of its earlier statement that a party mounting a

facial challenge "must establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987). Howsoever worded, this standard imposes a very heavy burden on a party who mounts a facial challenge to a state statute.

The statute at issue here implicates freedom of speech. Justice Cardozo long ago observed that freedom of speech is "the indispensable condition . . . of nearly every other form of freedom." Palko v. Connecticut, 302 U.S. 319, 327 (1937). But even so precious a freedom must, in particular iterations, be balanced against the government's legitimate interests in protecting public health and safety. See, e.g., Schenck v. United States, 249 U.S. 47, 52 (1919) ("The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre.") (Holmes, J.).

In striking this delicate balance, a court must calibrate the scales differently depending on the nature of the governmental action. McGuire I, 260 F.3d at 42. That calibration takes place along a continuum. See Berner v. Delahanty, 129 F.3d 20, 28 (1st Cir. 1997). At one end of the continuum are laws in which the government attempts to differentiate between divergent views on a singular subject; that is, laws in which the government attempts to "pick and choose among similarly situated speakers in order to advance or suppress a particular ideology or outlook." Id. Such

viewpoint-based discrimination is highly offensive to the core values of the First Amendment, and courts are wary of such encroachments. See, e.g., Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829 (1995).

Even when a law does not favor one particular viewpoint over another, governmental restrictions on the content of speech may be impermissible. See Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 641-42 (1994). At this stage of the continuum, a reviewing court must start with a presumption that such a content-based regulation is constitutionally suspect. R.A.V. v. City of St. Paul, 505 U.S. 377, 383 (1992); Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 736 (1st Cir. 1995). That presumption can be rebutted by a showing that the regulation is both necessary to the furtherance of a compelling state interest and narrowly tailored to the achievement of that interest. See, e.g., Boos v. Barry, 485 U.S. 312, 321 (1988).

Further along the continuum are laws that do not regulate speech per se but, rather, regulate the time, place, and manner in which speech may occur. Because such time-place-manner restrictions are by definition content-neutral, they tend to burden speech only incidentally; that is, they burden speech for reasons unrelated to either the speaker's viewpoint or the speech's content. See Turner Broad., 512 U.S. at 642. Regulations of this type will be upheld as long as "they are justified without reference to the content of

-10-

the regulated speech, . . . are narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (quoting Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984)).  This more relaxed standard, familiarly known as "intermediate scrutiny," is justified because the fact that a regulation is both content-neutral and viewpoint-neutral helps to ensure that government is not using the regulation as a sub rosa means of interfering in areas to which First Amendment protections pertain.  See Turner Broad., 512 U.S. at 642.

## B.  Content Neutrality.

What we have said to this point leads naturally to the threshold question in this case.  The district court found the 2007 Act to be content-neutral.  McCullen, 573 F. Supp. 2d at 403.  The plaintiffs demur.  Because the resolution of this dispute will determine the contours of our subsequent analysis (including the appropriate level of scrutiny), we tackle this question first.

Our principal inquiry in this regard, both in speech cases generally and in time-place-manner cases specifically, "is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." Ward, 491 U.S. at 781. "Thus, a law designed to serve purposes unrelated to the content of protected speech is deemed content-neutral even if, incidentally,

-11-

it has an adverse effect on certain messages while leaving others untouched." McGuire I, 260 F.3d at 43; accord McGuire II, 386 F.3d at 57.

The lower court, relying mainly on Hill, 530 U.S. at 719-20, determined that the 2007 Act was content-neutral because it did not regulate speech — merely the places in which speech might occur. McCullen, 573 F. Supp. 2d at 403. Moreover, the law was enacted in response to legitimate safety and law enforcement concerns, and was justified by those objectives without reference to the content of any speech. Id.

The plaintiffs resist this characterization. They acknowledge that the statute has a content-neutral patina, but they insist that this patina masks a more sinister reality. They point to several "facts" which, in their estimation, collectively indicate that the legislature's abiding motive was to curb anti-abortion speech. Specifically, the plaintiffs assert that the expanded size of the buffer zone is suspicious; that the zone itself, as reconfigured, contradicts its stated "public safety" goal in that it causes more safety hazards than it abates; that the legislature deliberately drew its evidence from biased sources, in effect listening to only one side of the story; that this court's characterizations of the 2000 Act, McGuire I, 260 F.3d at 49, belie the legislators' professed concerns about enforcement of that law; and that the nonexistent "emergency" referenced in the preamble to

-12-

the 2007 Act is a figment of the legislators' collective imagination (and thus, a cover-up for the legislature's real agenda).

Although a few of the factual components of this broadside are new and others have been refurbished or reworked, the broadside itself is on the order of one that was leveled against the 2000 Act and soundly rebuffed in McGuire I. There, we wrote:

> To be sure, the plaintiffs insist that the state's professed concerns about public safety, personal security, and access to medical facilities are mere pretexts for its desire to censor anti-abortion speech. This insistence gets them nowhere. For one thing, their insinuations are unsupported by any record evidence. For another thing, where differential treatment is justified, on an objective basis, by the government's content-neutral effort to combat secondary effects, it is insufficient that a regulation may have been adopted in direct response to the negative impact of a particular form of speech.

Id. at 45. So it is here.

As in McGuire I, the plaintiffs' basic complaint is that alleged deficiencies in the factual record compiled by the legislature — gaps, distortions, mischaracterizations, and the like — compel an inference of pretext. But as in McGuire I, our independent review of the record confirms that the legislative factfinding adequately underpins what the legislature wrought. We need not cite book and verse. Although the plaintiffs, ably represented, have done a thorough job of fly-specking the legislative record, their claim of pretext is no more effective than was the counterpart claim advanced in McGuire I. Consequently, it

-13-

is enough to note our wholehearted agreement with the district court that the record is "replete with factual references to specific incidents and patterns of problematic behavior around RHCFs." McCullen, 573 F. Supp. 2d at 405. In the final analysis, the claim of factual inadequacy amounts to little more than wishful thinking.

We nonetheless consider it wise to embellish two points. First, the fact that we spoke approvingly of the 2000 Act did not serve to freeze the statute in place. The legislature had a right (some might say an obligation) to monitor the statute's operation and to revisit the matter if experience revealed unexpected problems. See Ward, 491 U.S. at 800; Nat'l Amusements, 43 F.3d at 742.

Second, the test for content neutrality does not require proof that the legislature's response to a perceived problem be the only solution or even the best solution; it simply requires that the evidence support a conclusion that the regulation is in service to a legitimate governmental interest unrelated to expressive content. McGuire II, 386 F.3d at 58; McGuire I, 260 F.3d at 44. In grading a regulation's efficacy under this test, a reviewing court must grant a significant degree of respect to the legislature's judgment. See Turner Broad., 520 U.S. at 195. Viewed through this deferential prism, the factfinding that undergirds the 2007 Act easily attains a passing grade.

In a related vein, the plaintiffs maintain that several features of the 2007 Act themselves constitute either content-based or viewpoint-based discrimination. These features include the exception for clinic employees and agents, the statute's alleged under-inclusiveness (i.e., the fact that the legislature did not extend it to other types of free-standing medical clinics), and the Attorney General's guidance letter.

This three-faceted structural argument is not original. Without exception, claims analogous to those that comprise it were addressed in our earlier decisions anent the 2000 Act. See McGuire II, 386 F.3d at 56-59; McGuire I, 260 F.3d at 44-47. Those decisions render superfluous any exegetic discussion of the current version of the structural argument. For now, it suffices to say that the mere fact that a content-neutral law has a disparate impact on particular kinds of speech is insufficient, without more, to ground an inference that the disparity results from a content-based preference. See McGuire II, 386 F.3d at 57; McGuire I, 260 F.3d at 44. Here, there is no "more."

To be sure, the plaintiffs strive to distinguish our earlier decisions and add the missing integers to the equation. Only two of these efforts deserve comment.

The argument that the law is content-based due to the exception permitting those persons associated with RHCFs (e.g., clinic workers and patients) but not others to enter the buffer zone

was squarely raised and squarely repulsed in McGuire I, 260 F.3d at 45-47. The present plaintiffs try to give that argument a new twist. They posit that the very size and nature of a 35-foot fixed buffer zone somehow changes the constitutional calculus and makes this exception less defensible. This is whistling past the graveyard.

The decisive question in a facial challenge is not whether a regulation is necessary to achieve the legislature's stated goal but, rather, whether a court can glean legitimate reasons for its existence. See id. at 47. This principle applies to the configuration of the buffer zone selected by the legislature. The size of that zone need only be reasonably related to the attainment of the legislature's goal. That some might think a 25-foot or 30-foot buffer zone sufficient is not the issue.

Here, moreover, differences in the buffer zone's dimensions and other characteristics do not tip the constitutional balance. Regardless of those differences, the exception for persons associated with RHCFs remains reasonably related to the legislature's legitimate public safety objectives. No more is exigible to reject this aspect of the plaintiffs' facial challenge.[2]

---

[2] This same reasoning also serves to defeat the plaintiffs' equal protection and viewpoint discrimination claims, each of which focuses on the legislature's decision to limit the reach of the relevant exception to persons associated with RHCFs.

Second, the plaintiffs maintain that the Attorney General's interpretive guidance (reprinted in the appendix) demonstrates that the 2007 Act is not content-neutral. In particular, they highlight the passage in the guidance letter in which the Attorney General uses the phrase "abortion and partisan speech." The force of this attack is dissipated by our decision in McGuire II, 386 F.3d at 58, in which we explained that a state official's interpretation of a statute, even if generally authoritative, cannot render an otherwise constitutional statute vulnerable to a facial challenge.

In sum, we find nothing in either the text or the legislative history of the 2007 Act that deprives that statute of content-neutral status. We proceed, therefore, with intermediate scrutiny, recognizing that the constitutionality of the 2007 Act turns on whether it is narrowly tailored and allows sufficient alternative means of communication. See, e.g., Clark, 468 U.S. at 293.

C. **Narrow Tailoring/Channels of Communication**.

A regulation is narrowly tailored if it (i) facilitates a substantial governmental interest that would be less effectively served without the regulation and (ii) accomplishes this end without burdening substantially more speech than necessary. Ward, 491 U.S. at 799.

-17-

The first element of this two-part definition is not seriously disputed here. The interests ascribed by the legislature to the 2007 Act (enhancing public safety around RHCFs, improving traffic flow, and the like) are the same as those that we deemed both proper and substantial in McGuire I, 260 F.3d at 48 (describing those interests as "precisely the sort of interests that justify some incidental burdening of First Amendment rights").

It is the second part of the definition that draws the plaintiffs' fire: they argue that the 2007 Act regulates too much speech. But this argument rests on a misconception; it assumes that, in order to survive intermediate scrutiny, a law (and within a law, a buffer zone) must burden no more speech than is absolutely necessary to accomplish the law's legitimate purpose.

Perscrutation of the plaintiffs' briefs makes it apparent that this misconception arises out of a misreading of the Court's decisions in Schenck v. Pro-Choice Network, Inc., 519 U.S. 357 (1997), and Madsen v. Women's Health Center, 512 U.S. 753 (1994). In each instance, the Court applied a "no greater restriction than necessary" standard to determine the validity of an injunction. See Schenck, 519 U.S. at 374; Madsen, 512 U.S. at 765. But injunctions (which bind only the parties in a particular case and those in privity with them) are more targeted than statutes (which apply broadly to all concerned). This is a critically important distinction; the Court has made it pellucid that the absence of

-18-

general applicability subjects injunctions to a stricter standard than legislative enactments. See Madsen, 512 U.S. at 764-65; cf. Ry. Exp. Agency, Inc. v. New York, 336 U.S. 106, 112 (1949) ("[T]here is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally.") (Jackson, J., concurring). A law of general application passes muster under narrow tailoring principles as long as it is not substantially broader than necessary to accomplish the legislature's legitimate goal. See Ward, 491 U.S. at 799; see also Madsen, 512 U.S. at 764.

Ward supplies the measuring stick that we must wield. The 2007 Act is a law of general application. Given that it promotes a substantial public interest, McGuire I, 260 F.3d at 48, the decisive question is whether it burdens substantially more speech than necessary to serve that purpose. If the answer to that query is in the negative, the law does not offend the First Amendment "simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." Ward, 491 U.S. at 800. This means, of course, that "a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted"

-19-

are not conditions precedent to upholding a time-place-manner restriction.  <u>Id.</u>

That conclusion effectively ends this aspect of the matter.  Testimony from law enforcement officers and clinic workers attested to the ineffectiveness of the preexisting law.  Against that backdrop, the legislature determined, after considerable study, that the state's declared interests would be better served by reconfiguring the buffer zone around RHCFs.  The legislature labored to balance First Amendment concerns with public safety concerns, <u>see</u> <u>McCullen</u>, 573 F. Supp. 2d at 397-98 (recounting evidence), mulled the advantages and disadvantages of variously configured buffer zones, and decided (reasonably, we think) that a 35-foot fixed buffer zone made sense.  Given the deference that is owed to such legislative judgments, <u>see</u> <u>Turner Broad.</u>, 520 U.S. at 195, we cannot say that the 2007 Act is substantially broader than necessary.

The fact that the legislature reached a different conclusion seven years earlier (when it preferred a smaller buffer zone that had both floating and fixed components) does not undercut this conclusion.  After all, legislative choice is a dynamic process.  Simply because a legislature previously has attempted to address a particular problem in one way does not disable it from taking a different approach at a later time.  <u>See</u>, <u>e.g.</u>, <u>Ward</u>, 491 U.S. at 800 (justifying increased regulation based on evidence of inadequacy of municipality's prior attempts to combat noise); <u>Nat'l</u>

Amusements, 43 F.3d at 742 n.9 (similar); cf. Rust v. Sullivan, 500 U.S. 173, 187 (1991) (affirming agency's reversal of position while noting that in exercising legislatively delegated authority agency is free to consider "the wisdom of its policy on a continuing basis"). Experience is often the best teacher, and the incremental nature of the legislature's actions seems more a virtue than a vice. On these facts, the legislature's judgment must be respected. See Turner Broad., 520 U.S. at 195.

Relatedly, the plaintiffs suggest that the 2007 Act is constitutionally infirm because it amounts to a ban on handbilling and interferes with the provision of an eight-to-fifteen-foot "constitutional conversational distance." That suggestion is jejune.

Contrary to the plaintiffs' importunings, the Constitution neither recognizes nor gives special protection to any particular conversational distance. See, e.g., Schenck, 519 U.S. at 380 (upholding a fixed 15-foot buffer zone). By the same token, handbilling is not specially protected. See Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 654 (1981). Time-place-manner regulations routinely make particular forms of expression impracticable without raising constitutional concerns. See, e.g., Hill, 530 U.S. at 726-28. As we explained in Bl(a)ck Tea Society v. City of Boston, 378 F.3d 8, 14 (1st Cir. 2004), there is no constitutional guarantee of any particular form or mode of

-21-

expression. The correct inquiry is whether, in light of the totality of the circumstances, a time-place-manner regulation burdens substantially more speech than necessary and, concomitantly, whether such a regulation leaves open adequate alternative channels of communication. See Clark, 468 U.S. at 293.

This brings us to the question of whether the 2007 Act satisfies the last half of this prescription — the half that deals with alternative channels of communication. To begin, the 2007 Act places no burden at all on the plaintiffs' activities outside the 35-foot buffer zone. They can speak, gesticulate, wear screen-printed T-shirts, display signs, use loudspeakers, and engage in the whole gamut of lawful expressive activities. Those messages may be seen and heard by individuals entering, departing, or within the buffer zone.

Additionally, the plaintiffs may stand on the sidewalk and offer either literature or spoken advice to pedestrians, including those headed into or out of the buffer zone. Any willing listener is at liberty to leave the zone, approach those outside it, and request more information.

To cinch matters, the size of the zone is not unreasonable. It bears repeating at this point that we are dealing exclusively with a facial challenge to the 2007 Act. Thus, as long as we can envision circumstances in which a 35-foot buffer zone

allows adequate alternative means of expression, the challenge must fail.  See Wash. State Grange, 128 S. Ct. at 1190.

It is easy to envision such a scenario.  Indeed, the zone at issue here is slightly smaller than that upheld in Madsen, 512 U.S. at 768-70 (validating a 36-foot buffer zone under a standard stricter than that which is applicable here).  By like token, the zone at issue here is substantially smaller than the fixed portion of the buffer zone approved in Hill, 530 U.S. at 703 (upholding a floating buffer zone within a 100-foot fixed buffer zone).  Also instructive is Burson v. Freeman, 504 U.S. 191 (1992), in which the Court, applying strict scrutiny to a content-based regulation, approved a 100-foot buffer zone for polling places.  Id. at 211.  While there is no particular buffer zone radius that is per se permissible or impermissible — everything depends on context — the radius here is not, on its face, constitutionally deficient.

To say more on the binary question of narrow tailoring and alternative channels of communication would be supererogatory.  In the circumstances revealed by the record, the 2007 Act, on its face, is a valid time-place-manner regulation that advances a significant governmental interest without burdening substantially more speech than necessary and leaves open adequate alternative channels of communication.  Accordingly, the statute survives intermediate scrutiny.

## D.  **Overbreadth**.

First Amendment challenges based on a statute's alleged overbreadth are more readily accommodated than other types of facial challenges.  The main difference is that courts will consider overbreadth challenges even though the challenger's own free speech rights are not implicated.  See Broadrick v. Oklahoma, 413 U.S. 601, 612 (1973).  This leniency results from a judicial "assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." Id.  The plaintiffs mount such a challenge.  They argue that the 2007 Act cannot constitutionally be applied to the wide universe of people who might want to linger in the buffer zone and express their views.  They liken this case to Board of Airport Commissioners v. Jews For Jesus, in which the Supreme Court struck down as overbroad an outright ban on all First Amendment activity within a major international airport.  482 U.S. 569, 577 (1987).

The matter at hand is readily distinguishable from Jews for Jesus.  That case involved a direct ban on First Amendment activity, whereas this case involves a time, place, and manner restriction.  The Court has left no doubt but that time-place-manner restrictions should not be analyzed in the same way as direct bans on speech.  See Hill, 530 U.S. at 731.

In all events, the plaintiffs' overbreadth argument is eerily reminiscent of one considered and rejected in Hill.  There,

the challengers asserted that the Colorado statute was overbroad because it applied to all medical clinics, not just to abortion providers. The Court debunked that assertion, stating that "[t]he fact that the coverage of a statute is broader than the specific concern that led to its enactment is of no constitutional significance." Id. at 730-31; see id. at 723 (approvingly noting that the statute applies "equally to used car salesmen, animal rights activists, fundraisers, environmentalists, and missionaries").

That logic is persuasive here. Although the Massachusetts legislature was plainly moved to enact the statute by the secondary effects of anti-abortion protests, it opted to address the secondary effects of a broader range of activities in the interest of effective enforcement. This decision to widen the statute's coverage is a matter of degree, not a matter of kind. Legislatures are not held to standards of mathematical precision where policy judgments are concerned. See, e.g., Burson, 504 U.S. at 210 (describing the question of whether a 100-foot buffer zone could be reduced by 25 feet as not of "constitutional dimension"). Here, the increased degree of the expansion is reasonable, so the expansion is not a matter of constitutional significance. See Hill, 530 U.S. at 730-31; Burson, 504 U.S. at 210; see also City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 802 (1984) (explaining that "if the ordinance may be validly applied to [the

plaintiffs], it can be validly applied to [a broader range of persons]").

There is, moreover, a paradox that taints the plaintiffs' overbreadth argument. The plaintiffs say, in effect, that the 2007 Act should have been limited to abortion-related speech. Yet the absence of any reference to any particular kind of speech (and, thus, to any particular content or viewpoint) is what makes the statute content-neutral. See Hill, 530 U.S. at 723; Burson, 504 U.S. at 207. If a failure to distinguish among speakers in itself gave rise to overbreadth problems, legislatures would be forced to choose between passing laws that were not content-neutral or laws that were overbroad. Hill pretermits the contention that the First Amendment forces state legislatures to face this sort of Morton's Fork.

We have yet another bridge to cross. At oral argument in this court, the plaintiffs essayed a new and different spin on overbreadth — a perspective that emerged during the panel's questioning. Seizing upon this perspective, the plaintiffs suggested that the Attorney General's guidance letter might be read to criminalize the conduct of anyone who engages in any "partisan speech," whether or not abortion-related, while passing though the buffer zone. This interpretation raises the concern that an individual could be prosecuted merely for passing through the buffer zone en route to a destination outside the zone while, say, wearing

a lapel pin advocating the election of a political candidate or a T-shirt exhorting a favorite baseball team.

Though interesting, this argument is untimely. It was not raised either in the district court or in the plaintiffs' briefs on appeal.[3] It is, therefore, waived. See United States v. Slade, 980 F.2d 27, 30 (1st Cir. 1992) ("It is a bedrock rule that when a party has not presented an argument to the district court, she may not unveil it in the court of appeals."); Anderson v. Beatrice Foods Co., 900 F.2d 388, 397 (1st Cir. 1990) (holding that an appellant's briefs fix the scope of the issues appealed and that, therefore, an appellant cannot breathe life into an omitted theory merely by referring to it at oral argument). That the court inquired about the theory at oral argument does not lower this bar.

We add a coda. Were we to reach the merits of this argument — which we do not — the proper resolution of it is not obvious. The Supreme Court has cautioned that "[t]he overbreadth doctrine is strong medicine that is used sparingly and only as a

---

[3] To be sure, the plaintiffs' general overbreadth argument implicitly attacks the exceptions to the 2007 Act. But avoiding waiver requires more than a hint that a particular theory may be lurking; it necessitates some developed argumentation addressed to that particular theory. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

The plaintiffs also argued below that the legislature's use of the word "solely" in the statutory text rendered the statute unconstitutionally vague. See McCullen, 573 F. Supp. 2d at 421. Although their newly minted argument likewise involves, in part, the statute's use of the word "solely," it is a conceptually different argument.

last resort." N.Y. State Club Ass'n v. City of New York, 487 U.S. 1, 15 (1988). Thus, a court may overturn a law as overbroad only if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." Wash. State Grange, 128 S. Ct. at 1191 n.6. Courts must "vigorously enforce" this substantiality requirement. United States v. Williams, 128 S. Ct. 1830, 1838 (2008). In this case, it seems likely that the alleged overbreadth is not sufficiently sprawling to serve as the foundation for a constitutional challenge.

### E. **Vagueness**.

The plaintiffs contend that the Attorney General's guidance letter renders the 2007 Act void for vagueness because it uses the term "partisan speech" — a term that is allegedly so amorphous "that persons of average intelligence would have no choice but to guess at its meaning and modes of application." United States v. Hussein, 351 F.3d 9, 14 (1st Cir. 2003). We reject this contention.

The Due Process Clause forbids the sovereign from depriving an individual of liberty pursuant to an excessively vague law. See id.; United States v. Arcadipane, 41 F.3d 1, 5 (1st Cir. 1994). This doctrine prevents the enforcement of laws that fail to give persons of ordinary intelligence a reasonable opportunity to know what conduct is proscribed and what is not. Hill, 530 U.S. at 732; Hussein, 351 F.3d at 14. The Due Process Clause also forbids

laws that impermissibly delegate basic policy matters to adjudicators for resolution on an ad hoc or largely subjective basis, thus threatening arbitrary and discriminatory application. Grayned v. City of Rockford, 408 U.S. 104, 108-09 (1972).

In the district court, the plaintiffs alleged that the 2007 Act was impermissibly vague because of the uncertainty inherent in the terms "solely" and "destination." See McCullen, 573 F. Supp. 2d at 421. They also argued that the term "partisan speech," provided as a gloss in the Attorney General's guidance letter (reprinted in the appendix), rendered the statute vague. Id. In this venue, the plaintiffs address only the term "partisan speech," a phrase found exclusively in the guidance letter.

When confronting a vagueness challenge to the face of a state statute, we are obliged to accept any limiting construction that a state agency has authoritatively proffered. Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 n.5 (1982). It is difficult to understand, however, how or why a challenger can mount a facial attack on a statute that is itself not vague simply because an enforcement official has offered an interpretation of the statute that may pose problems down the road. See McGuire II, 386 F.3d at 58; see also Grayned, 408 U.S. at 108-09. As a matter of logic, we do not believe that an official's interpretation can render clear statutory language vague so as to make the statute

-29-

vulnerable to a facial (as opposed to an as-applied) attack.[4]  See McGuire II, 386 F.3d at 58; see also United States v. Protex Indus., Inc., 874 F.2d 740, 743 (10th Cir. 1989) (noting that a statute can be void for vagueness, as applied, as a result of a retroactive expansion of precise statutory language through interpretation).

Even were we to assume arguendo that the plaintiffs' underlying point is that the statute itself is vague and that this lack of precision is exacerbated by the Attorney General's guidance letter, another obstacle would loom.  Although the word "partisan" may be vague at the margins, but see Broadrick, 413 U.S. at 608, that uncertainty would have no relevance here.  After all, the plaintiffs, by their own admission, want to engage in anti-abortion protests; and that conduct, as they must know, falls squarely within the hard core of the proscriptions spelled out in the guidance letter.

We need go no further.  "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness." Parker v. Levy, 417 U.S. 733, 756 (1974); see Broadrick, 413 U.S. at 608.  That is precisely the situation here.

### F.  Prior Restraint.

We need not linger long over the plaintiffs' claim that the 2007 Act constitutes an impermissible prior restraint on speech.

---

[4] The situation may well be different if the statute itself is vague or ambiguous — but that is not the premise of the vagueness argument that the plaintiffs are making here.

-30-

The case law makes manifest that time-place-manner restrictions are analyzed under intermediate scrutiny and not under the more rigorous standard that applies to prior restraints.  See, e.g., Bl(a)ck Tea Soc'y, 378 F.3d at 12.  Consequently, our determination that the 2007 Act is a valid time-place-manner restriction effectively forecloses the plaintiffs' resort to case law involving prior restraints.  See id. ("If content-neutral prohibitions on speech at certain places were deemed prior restraints, the intermediate standard of review prescribed in the time-place-manner jurisprudence would be eviscerated.").

## IV.  CONCLUSION

To recapitulate, the 2007 Act represents a permissible response by the Massachusetts legislature to what it reasonably perceived as a significant threat to public safety.  It is content-neutral, narrowly tailored, and leaves open ample alternative channels of communication.  It is, therefore, a valid time-place-manner regulation, and constitutional on its face.

We add a caveat.  This decision flows naturally from the very heavy burden that plaintiffs must carry in mounting a facial challenge to a state statute.  Nothing that we have said forecloses the possibility that, on a better-developed record, this legislative solution may prove problematic in particular applications.


**Affirmed**.

-31-

## Appendix I: The Attorney General's Guidance.

The first exemption — for persons entering or leaving the clinic — only allows people to cross through the buffer zone on their way to or from the clinic.  It does not permit companions of clinic patients, or other people not within the scope of the second or third exemptions, to stand or remain in the buffer zone, whether to smoke, talk with others, or for any other purpose.

The second exemption — for employees or agents of the clinic acting within the scope of their employment — allows clinic personnel to assist in protecting patients and ensuring their safe access to clinics, but does not allow them to express their views about abortion or to engage in any other partisan speech within the buffer zone.

Similarly, the third exemption — for municipal employees or agents acting within the scope of their employment — does not allow municipal agents to express their views about abortion or to engage in any other partisan speech within the buffer zone.

Finally, the fourth exemption — for persons using the sidewalk or street adjacent to the clinic to reach a destination other than the clinic — applies to individuals who are crossing through the buffer zone, without stopping, to go somewhere other than a location within the zone and other than the clinic, and who are not using the buffer zone for some other purpose while passing through.  For example, an individual may cross through the buffer zone to reach and speak with someone outside the zone, to reach and stand in a location outside the zone (perhaps to engage in lawful protest, other speech, or prayer), or to travel on to another place altogether, provided that the individual does not do anything else within the buffer zone (such as expressing their views about abortion or engaging in other partisan speech).