# United States Court of Appeals
## For the First Circuit

No. 12-1334

ELEANOR McCULLEN ET AL.,

Plaintiffs, Appellants,

v.

MARTHA COAKLEY ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Boudin,[*] Selya and Stahl,

Circuit Judges.

Mark L. Rienzi, with whom Edward C. DuMont, Todd C. Zubler, Wilmer Cutler Pickering Hale and Dorr LLP, Philip D. Moran and Michael J. DePrimo, were on brief, for appellants.
William W. Porter, Assistant Attorney General, with whom Martha Coakley, Attorney General of Massachusetts, Kenneth W. Salinger and Gabrielle Viator, Assistant Attorneys General, were on brief, for appellees.

January 9, 2013

_____

[*]Judge Boudin heard oral argument in this matter and participated in the semble, but he did not participate in the issuance of the panel's opinion. The remaining two panelists have issued the opinion pursuant to 28 U.S.C. § 46(d).

**SELYA**, **Circuit Judge**.  This case does not come to us as a stranger.  At the turn of the century, the Massachusetts legislature passed a law that created fixed and floating buffer zones around abortion clinics.  We rejected serial challenges to the constitutionality of that law.  See McGuire v. Reilly (McGuire I), 260 F.3d 36 (1st Cir. 2001) (rejecting facial challenge); McGuire v. Reilly (McGuire II), 386 F.3d 45 (1st Cir. 2004) (rejecting as-applied challenge).  The Supreme Court denied certiorari.  544 U.S. 974 (2005).

One might have thought that the matter would end there, but it did not.  In 2007, the legislature revisited the statute and amended it to create a fixed thirty-five-foot buffer zone around the entrances, exits, and driveways of abortion clinics.  The revised statute drew renewed fire and, in 2009, we upheld it against a facial challenge.  See McCullen v. Coakley (McCullen I), 571 F.3d 167 (1st Cir. 2009), cert. denied, 130 S. Ct. 1881 (2010).  This decision left open the plaintiffs' as-applied challenge, and they unsuccessfully pursued that initiative in the district court.  See McCullen v. Coakley (McCullen II), 759 F. Supp. 2d 133 (D. Mass. 2010) (granting judgment on the pleadings on certain issues); McCullen v. Coakley (McCullen III), 844 F. Supp. 2d 206 (D. Mass. 2012) (resolving remaining issues after trial).

The plaintiffs again appeal.  They advance a salmagundi of arguments, old and new, some of which are couched in a creative recalibration of First Amendment principles.

Few subjects have proven more controversial in modern times than the issue of abortion.  The nation is sharply divided about the morality of the practice and its place in a caring society.  But the right of the state to take reasonable steps to ensure the safe passage of persons wishing to enter healthcare facilities cannot seriously be questioned.  The Massachusetts statute at issue here is a content-neutral, narrowly tailored time-place-manner regulation that protects the rights of prospective patients and clinic employees without offending the First Amendment rights of others.  We therefore affirm the judgment below.

## I.  BACKGROUND

We briefly recount the historical background and travel of the case and then describe the particular circumstances concerning the three clinic locations that lie at the epicenter of the plaintiffs' as-applied challenge.

### A.  Travel of the Case.

The centerpiece of this saga is Mass. Gen. Laws ch. 266, § 120E 1/2 (2007) (the Act).  The provenance and pertinent provisions of the Act are set out in some detail in McCullen I, 571 F.3d at 172-74, and we assume the reader's familiarity with that

account.  We rehearse here only what is necessary to place into perspective the issues on appeal.

The Act states in pertinent part that "[n]o person shall knowingly enter or remain on a public way or sidewalk adjacent to a reproductive health care facility" (RHCF) within a designated and clearly marked buffer zone.  Mass. Gen. Laws ch. 266, § 120E 1/2(b), (c).  The buffer zone spans

> a radius of 35 feet of any portion of an entrance, exit or driveway of a[n RHCF] or within the area within a rectangle created by extending the outside boundaries of any entrance, exit or driveway of a[n RHCF] in straight lines to the point where such lines intersect the sideline of the street in front of such entrance, exit or driveway.

Id. § 120E 1/2(b).  Four categories of persons identical to those enumerated in the 2000 version of the law are exempted:

> (1) persons entering or leaving such facility;
> (2) employees or agents of such facility acting within the scope of their employment;
> (3) law enforcement, ambulance, firefighting, construction, utilities, public works and other municipal agents acting within the scope of their employment; and
> (4) persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility.

Id.

On January 25, 2008, the Massachusetts Attorney General sent a letter to a wide audience, including RHCF personnel and law enforcement agencies.  The text of the letter is reproduced as an appendix to our opinion in McCullen I, 571 F.3d at 184.  Its stated

-4-

purpose is to summarize the provisions of the Act and offer "guidance to assist [] in applying the four exemptions."

On January 16, 2008, the plaintiffs brought this action against the Massachusetts Attorney General in the federal district court.[1] Invoking 42 U.S.C. § 1983, they alleged a plethora of constitutional claims.

The district court bifurcated the case, separating the plaintiffs' facial challenge from their as-applied challenge. In due season, the court addressed the facial challenge and upheld the Act.

On appeal, we affirmed, holding the Act to be content-neutral, viewpoint-neutral, and a valid time-place-manner regulation. McCullen I, 571 F.3d at 176-81 & n.2. At the same time, we rebuffed the plaintiffs' overbreadth claim, citing Hill v. Colorado, 530 U.S. 703 (2000), in which the Supreme Court upheld a Colorado statute regulating communicative activities within 100 feet of healthcare facility entrances. See McCullen I, 571 F.3d at 181-82. We likewise rejected the plaintiffs' vagueness claim (which focused on the Attorney General's letter), explaining that such an attempt at interpretive guidance cannot alter the meaning

---

[1] The plaintiffs who remain in the case — others have come and gone — are Eleanor McCullen, Jean Blackburn Zarrella, Gregory A. Smith, Eric Cadin, Cyril Shea, Nancy Clark, and Mark Bashour. There has also been some movement on the defense side of the ledger: the plaintiffs have now added as defendants three district attorneys, each of whom has jurisdiction over a county in which one of the three specified clinics, see infra Part I(B), is located.

of a law that is clear on its face.  Id. at 182-83.  Finally, we ruled that the Act did not constitute an unlawful prior restraint on protected speech.  Id. at 183-84.

When the dust had settled, the district court took up the plaintiffs' as-applied challenge.  As a threshold matter, it invoked the law of the case doctrine and resisted the plaintiffs' attempt to reargue the facial constitutionality of the Act. McCullen II, 759 F. Supp. 2d at 136-41.  Next, it granted the defendants' motion for judgment on the pleadings with respect to seven as-applied counts.  Id. at 141-45.  Turning to whether the Act, as applied, constituted a valid time-place-manner regulation, the court concluded that the only trialworthy issue concerned the adequacy of alternative channels of communication at the challenged facilities.  Id. at 145.  Following a bench trial, the court upheld the Act as applied.  McCullen III, 844 F. Supp. 2d at 213-25.

## B.  The Three Sites.

We rehearse the evidence anent the relevant clinic locations.  As a prelude, we note that each of the plaintiffs engages in communicative activities outside one of these three RHCFs.

1.  **Boston**.  The Boston clinic is situated in a free-standing building at 1055 Commonwealth Avenue (a main thoroughfare in the Brighton section of Boston).  Its front door faces Commonwealth Avenue; its rear garage entrance faces Gardner Street.

All clinic patients enter through the front door and must use the twenty-five-foot-wide public sidewalk along Commonwealth Avenue. Buffer zones, marked with yellow arcs and posted signs, are appurtenant to each entrance.

Three of the plaintiffs (McCullen, Cadin, and Zarrella) regularly engage in "sidewalk counseling" at the Boston clinic. McCullen parks her car on Commonwealth Avenue and festoons it with pro-life signage; Zarrella sometimes prays aloud; and Cadin from time to time holds aloft a large pro-life sign.

A fourth plaintiff, Smith, has demonstrated outside the Boston clinic for many years. He has displayed a crucifix, sung religious hymns, and prayed aloud. His prayers are meant to be heard by passersby in hopes of persuading them to opt against abortion. He sometimes brings a loudspeaker to amplify group prayers that occur outside the clinic on the second Saturday of every month and on Good Friday.

The plaintiffs insist that they have achieved success in their counseling efforts: they speak with prospective patients, elicit responses, and hand out literature. In some instances, they have persuaded women to decide against terminating pregnancies. McCullen estimates that, during the period between November 2007 and May 2011, her sidewalk counseling convinced approximately eighty women to refrain from seeking abortions.

Despite their accomplishments, the plaintiffs argue that the buffer zones prevent close personal contact with their intended audience and, thus, impede their ability to communicate effectively. By way of illustration, Zarrella asserts that, although women "always" respond to her offers of enlightenment and assistance, she has not been able to convince any of them to opt out of an abortion since the 2007 buffer zones were put in place.

2. **Worcester**. The Worcester clinic is situated in a stand-alone building at 470 Pleasant Street. Its main entrance is accessible from Pleasant Street and also from a private parking lot behind the building. The public sidewalk on Pleasant Street is nearly fifty-four feet from the main door and staggered metal fences shield the front of the building and the private pedestrian walkway that runs between these points. Neither the fencing nor the walkway is on public property. The entrance to the parking lot is on Dewey Street and all vehicular traffic must use that entrance.

There are buffer zones marked with painted white arcs and posted signs on both Pleasant Street and Dewey Street. More than eighty-five percent of all patients arrive by car, park in the clinic's lot, and walk directly to the main door (without setting foot on any public way).

Two of the plaintiffs (Bashour and Clark) engage in sidewalk counseling at the Worcester clinic. They try to divert

-8-

women to Problem Pregnancy, a "pro-life pregnancy crisis center" located across the street. Bashour prays quietly outside the clinic, sometimes alone and sometimes with others. For her part, Clark often displays a large pro-life sign.

Here, too, the plaintiffs claim to have achieved some success in their counseling efforts. They speak with patients, distribute literature, and persuade women to refrain from seeking abortions. Notwithstanding these successes, the plaintiffs aver that the physical set-up renders their attempts to communicate "ineffective" by impeding their ability to view and approach individuals entering the front door, to make eye contact with patients, and to "demonstrate a caring demeanor." As they recall it, virtually no patients who park in the clinic's private lot respond to their overtures or "make the effort" to venture outside the clinic's premises. The buffer zones preclude them from speaking at "a normal conversational distance" with, or placing literature near, the vast majority of patients entering the clinic.

3. **Springfield**. The Springfield clinic is situated in a multi-tenant medical complex at the corner of Main Street and Wason Avenue. The building contains at least eight separate medical offices. It is bordered on two sides by private parking lots; a third side abuts another building; and the fourth side neighbors an open expanse that contains railroad trackage.

Approximately ninety percent of individuals patronizing the complex arrive by car and park in one of the lots.

There are five driveways leading to and from the complex, two of which have been painted with white arcs and posted to establish buffer zones: one on Main Street and one on Wason Avenue. The remaining three driveways have painted white arcs but no signs. They are not, therefore, buffer zones authorized by the Act. See Mass. Gen. Laws ch. 266, § 120E 1/2(c) (requiring signage to demarcate buffer zones). Consequently, they have no legal effect.

A plaintiff (Shea) prays aloud and engages in sidewalk counseling outside the clinic. He habitually displays a large sign that reads "They're Killing Babies Here." He laments that, from and after the creation of the buffer zones, he has not seen literature provided to anyone in a vehicle. He estimates that only five percent of those who arrive by car leave the clinic's parking lots either to accept pro-life literature or to investigate the possibility of counseling.

## II.   THE LAW OF THE CASE

We start our appraisal of the merits with the plaintiffs' exhortation that we revisit McCullen I, in which we held that the Act, on its face, is a constitutionally valid time-place-manner regulation. See McCullen I, 571 F.3d at 176-81. The district court found that the law of the case doctrine barred relitigation of this issue. McCullen II, 759 F. Supp. 2d at 136-41. We agree.

The law of the case doctrine has two branches. The first, which embodies the so-called mandate rule, "prevents relitigation in the trial court of matters that were explicitly or implicitly decided by an earlier appellate decision in the same case." United States v. Matthews, 643 F.3d 9, 13 (1st Cir. 2011) (internal quotation marks omitted). The second "binds a successor appellate panel in a second appeal in the same case to honor fully the original decision." Id. (internal quotation marks omitted). Both branches of the doctrine apply here.

To be sure, the law of the case doctrine admits of certain exceptions. But the circumstances giving rise to those exceptions are narrowly circumscribed:

> A party may avoid the application of the law of the case doctrine only by showing that, in the relevant time frame, controlling legal authority has changed dramatically; or by showing that significant new evidence, not earlier obtainable in the exercise of due diligence, has come to light; or by showing that the earlier decision is blatantly erroneous and, if uncorrected, will work a miscarriage of justice.

Id. at 14 (internal quotation marks omitted). Although the plaintiffs allude in desultory fashion to the third exception,[2]

---

[2] For example, the plaintiffs use the phrase "serious injustice" twice in their opening brief. This ipse dixit does not suffice, however, to put in play the third exception to the law of the case doctrine. See Ahmed v. Holder, 611 F.3d 90, 98 (1st Cir. 2010) (explaining that "appellate arguments advanced in a perfunctory manner, unaccompanied by citations to relevant authority, are deemed waived"); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (similar).

they make no reference to the second exception and their only colorable claim concerns the first exception.

The plaintiffs base their claim on recent decisions of the Supreme Court standing for the wholly unremarkable proposition that content-based and speaker-based speech restrictions are disfavored. See, e.g., Sorrell v. IMS Health Inc., 131 S. Ct. 2653 (2011); Snyder v. Phelps, 131 S. Ct. 1207 (2011); Citizens United v. FEC, 130 S. Ct. 876 (2010). In their view, these neoteric decisions have so reconfigured the First Amendment landscape as to justify a departure from the law of the case. This impressionistic argument, though ingenious, elevates hope over reason. The propositions for which the plaintiffs cite those cases are no more than conventional First Amendment principles recited by the Supreme Court in the context of factual scenarios far different than the scenario at issue here.

The decision on which the plaintiffs rely most heavily — Citizens United — is emblematic of this point. Citizens United overruled Austin v. Michigan Chamber of Commerce, 494 U.S. 652 (1990), which had held that corporate entities, as opposed to other speakers, could be prohibited from engaging in political speech. Citizens United, 130 S. Ct. at 886. The plaintiffs contend that Citizens United announced, for the first time, a blanket ban on all speaker distinctions, whatever the setting. This categorical ban,

they say, should serve to invalidate the Act as a speaker-specific restriction.

This is an imprecise reading of Citizens United. The Citizens United Court held that government cannot entirely prohibit corporate political speech. Id. In support, it invoked the "central principle" laid out in First National Bank of Boston v. Bellotti, 435 U.S. 765 (1978), to the effect "that the First Amendment does not allow political speech restrictions based on a speaker's corporate identity." Citizens United, 130 S. Ct. at 903. The Act, of course, makes no such distinction.

The plaintiffs, however, are undaunted. They seize upon an isolated statement in Citizens United: "Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others." See id. at 898. But they yank this statement from its context and they neglect to mention that the Court cites Bellotti — a case that substantially predates McCullen I — for this proposition. See id. at 898-99. The Court's reliance on Bellotti is not a mere fortuity. After all, the Citizens United Court described its decision as a return to classic First Amendment jurisprudence rather than a departure therefrom. See id. at 912. The Court did not retreat from its well-settled abortion clinic/buffer zone jurisprudence. See, e.g., Hill, 530 U.S. 703; Madsen v. Women's Health Ctr., Inc., 512 U.S. 753 (1994). Seen in this light, we cannot read Citizens United as undermining

-13-

the First Amendment foundation on which our rejection of the plaintiffs' facial challenge rested.

So, too, <u>Snyder</u>, in which the Court held that the First Amendment precludes tort liability against persons who had peacefully protested, on public property, at the funeral of a Marine. <u>Snyder</u>, 131 S. Ct. at 1213-14, 1220-21. Once again, the Court did no more than apply long-recognized First Amendment principles. And while it reiterated the special status of public streets as the "archetype of a traditional public forum," it proceeded to confirm that even public fora are subject to reasonable time-place-manner regulations.[3] <u>Id.</u> at 1218 (internal quotation marks omitted). It is especially telling that, in making this point, the Court referred specifically to the abortion clinic buffer zone that it had upheld in <u>Madsen</u>. See <u>id.</u>

The plaintiffs' reliance on <u>Sorrell</u> is equally mislaid. The <u>Sorrell</u> Court invalidated a Vermont law that restricted the sale, disclosure, and use of pharmacy records for marketing purposes. <u>Sorrell</u>, 131 S. Ct. at 2659. The law, on its face, was content-based and speaker-based, and had been enacted with the avowed purpose of "diminsh[ing] the effectiveness of marketing by manufacturers of brand-name drugs." <u>Id.</u> at 2662-63.

---

[3] This formulation is reminiscent of <u>Hill</u>, 530 U.S. at 715, in which the Court recognized sidewalks and areas outside healthcare clinics as "'quintessential' public forums" while upholding a buffer zone that limited communicative activities within those areas.

The case before us could not be more different. As we explained in McCullen I, 571 F.3d at 175-78, the Act is both content-neutral and speaker-neutral. Moreover, the legislature enacted it to serve a valid, non-speech-related purpose: public safety. See id. at 176.

In a Rumpelstiltskin-like effort to turn straw into gold, the plaintiffs dismiss these important differences and focus instead on the Sorrell Court's statement that "the inevitable effect of a statute on its face may render it unconstitutional." Sorrell, 131 S. Ct. at 2663 (internal quotation marks omitted). But this hoary legal precept (with which we agree) is not novel. The "inevitable effect" language derives from the Court's decision in United States v. O'Brien, 391 U.S. 367, 384 (1968), which comfortably predates both our decision in McCullen I and the Supreme Court's abortion clinic/buffer zone jurisprudence.

More to the point, the Sorrell precept is in no way inconsistent with our holding in McCullen I. The "inevitable effect" of the Act is to limit the communicative activities of all demonstrators (whether pro-choice or pro-life) to exactly the same extent.

The plaintiffs have also marshaled other recent Supreme Court cases in their ambitious effort to reinvent First Amendment doctrine. See, e.g., United States v. Stevens, 130 S. Ct. 1577 (2010). It would serve no useful purpose to canvass these cases.

-15-

For present purposes, it suffices that these decisions, by no stretch of even the most fertile imagination, sully either the reasoning or the doctrinal infrastructure of McCullen I.

The short of it is that the First Amendment principles underpinning our core holdings in McCullen I have not been materially altered, let alone abrogated, by any subsequent Supreme Court precedent. Accordingly, the district court did not err in declining the plaintiffs' invitation to set the law of the case doctrine to one side and revisit the plaintiffs' facial challenge to the Act.

## III. JUDGMENT ON THE PLEADINGS

The plaintiffs challenge the district court's entry of judgment on the pleadings on several fronts. We review de novo an order granting or denying judgment on the pleadings. Mass. Nurses Ass'n v. N. Adams Reg'l Hosp., 467 F.3d 27, 31 (1st Cir. 2006). To withstand a motion for judgment on the pleadings, a "complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face." Grajales v. P.R. Ports Auth., 682 F.3d 40, 44 (1st Cir. 2012) (internal quotation marks omitted).

### A. Viewpoint Discrimination.

The plaintiffs' principal challenge to the entry of judgment on the pleadings relates to their claim of viewpoint discrimination. They argue that Planned Parenthood employees and agents have abused the buffer zones and that this activity

-16-

constitutes viewpoint discrimination under the First Amendment. The district court rejected this argument on the pleadings, holding that the plaintiffs had not alleged sufficient facts to support the claim. See McCullen II, 759 F. Supp. 2d at 143-44.

In their complaint, the plaintiffs aver that "pro-choice advocates [] surround, cluster, yell, make noise, mumble, and/or talk loudly to clinic clients for the purpose of disrupting or drowning out pro-life speech and thwart Plaintiffs' efforts to distribute literature." They further aver that clinic "employees and/or agents stand idly on the public sidewalks and streets inside the [buffer] zone" — sometimes smoking, speaking with each other or on mobile phones, or drinking coffee — "even when clinic clients are not present."

Because this issue was resolved at the pleading stage, we assume arguendo that the raw facts are as the plaintiffs have alleged. The question remains, however, whether the depicted conduct can fairly be characterized as viewpoint discrimination attributable to the state. The plaintiffs say that it can. The Attorney General demurs.

We begin with the basics. The Act, on its face, is viewpoint-neutral. See McCullen I, 571 F.3d at 178 & n.2. Although it contains a "clinic employee" exemption, that exemption does not purport to allow either advocacy by an exempt person or interference by an exempt person with the advocacy of others.

-17-

The plaintiffs strive mightily to overcome this obstacle. They call our attention to the decision in Hoye v. City of Oakland, 653 F.3d 835 (9th Cir. 2011). There, a municipal ordinance prohibited, within a 100-foot zone around entrances to RHCFs, any knowing or willful "approach within eight feet of an individual seeking entry to the clinic if one's purpose in approaching that person is to engage in conversation, protest, counseling, or various other forms of speech." Id. at 839. The Ninth Circuit concluded that the ordinance was constitutional on its face but unconstitutional as applied. Id. at 849, 856. It predicated this conclusion on a determination that the city did not evenly enforce the ordinance; rather, the city's actions manifested "a firm policy of enforcing the Ordinance . . . only [against] efforts to persuade women approaching [RHCFs] . . . not to receive abortions or other reproductive health services, and not [against] communications seeking to encourage entry into the clinic for the purpose of undergoing treatment." Id. at 849-50 (emphasis in original).

This case is at a considerable remove from Hoye. The Hoye court's finding of uneven enforcement was inevitable in light of the city's frank admission that it consciously "enforces the Ordinance in a content-discriminatory manner." Id. at 850. In

-18-

contrast, the plaintiffs here have not pleaded any facts that might suffice to ground a claim of uneven enforcement.[4]

The conduct described, without more, has nothing to do with the First Amendment.  While loitering in a buffer zone by an exempt person is not expressive in nature and arguably does not serve the purposes of the Act, such conduct, simpliciter, does not prefer one viewpoint over another.[5]

What is more, the employees and agents about whom the plaintiffs complain are not state actors but — unlike the municipal police officers in Hoye — are agents of a private entity (Planned Parenthood).  The Act allows these individuals to be in buffer zones under the clinic employee exemption.  But to the extent that they have tried to use their exempt status either to advocate a particular point of view or to drown out the plaintiffs' message, there is no allegation that such behavior has been sanctioned by the state.

---

[4] The plaintiffs attempt to rely upon declarations and deposition testimony amplifying these allegations.  We add, however, that even if we were free to consider these extraneous materials, they would not suffice to make out a claim of viewpoint discrimination.  Such extraneous materials are beyond the scope of appellate review of a judgment on the pleadings.  See NEPSK, Inc. v. Town of Houlton, 283 F.3d 1, 8 (1st Cir. 2002); Int'l Paper Co. v. Town of Jay, 928 F.2d 480, 482 (1st Cir. 1991).

[5] We say "arguably" because it may be necessary for escorts to spend idle time in the buffer zones in order to keep themselves available to assist incoming patients — a task consistent with the purpose of the exemption.

-19-

Another point is worth making. If the plaintiffs believed themselves to be aggrieved by the employee/agent behavior that they describe, the commonsense remedy would have been to complain to police officers or other state authorities. The pleadings are barren of any allegation that such a complaint was ever made.

The bottom line is that, to be cognizable, a claim of uneven enforcement requires state action. See McGuire II, 386 F.3d at 60 ("The First Amendment is concerned with government interference, not private jousting in the speech marketplace."). Whatever actions the clinic employees and agents may have taken, this record reveals no basis for a plausible claim that those actions reflect a viewpoint preference of the state. See id. at 59-60.

## B. __Overbreadth__.

The plaintiffs assign error to the district court's entry of judgment on the pleadings with respect to their overbreadth claim. Although they concede that we rejected a substantially similar overbreadth claim in McCullen I, 571 F.3d at 181-82, they suggest that the Act may be overbroad in particular applications.

Overbreadth doctrine invalidates statutes "not because [the plaintiffs'] own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain

from constitutionally protected speech or expression." Hill, 530 U.S. at 731-32 (internal quotation marks omitted). But overbreadth must be both "real" and "substantial," as assessed "in relation to the statute's plainly legitimate sweep." Id. at 732 (internal quotation marks omitted). "Where an overbreadth attack is successful, the statute is obviously invalid in all its applications, since every person to whom it is applied can defend on the basis of the same overbreadth." Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 483 (1989) (emphasis in original). Thus, the appropriate analysis "requires consideration of many more applications than those immediately before the court." Id. at 485.

In the case at hand, the parties spar over whether there is such a creature as an as-applied overbreadth challenge. Compare, e.g., Farrell v. Burke, 449 F.3d 470, 498 (2d Cir. 2006) (asserting that "[a]ll overbreadth challenges are facial challenges"), with, e.g., Turchick v. United States, 561 F.2d 719, 721 n.3 (8th Cir. 1977) (suggesting the contrary). We need not grapple with this conundrum because, even if some overbreadth challenges may contain an as-applied component, this one does not.

In explaining the district court's supposed error, the plaintiffs repeat their complaint, rejected on their facial challenge, that all communicative activities (as opposed to, say, purely violent or aggressive activities) are banned within buffer zones. In attempting to convert this previously rejected challenge

into a viable as-applied challenge, they posit that <u>McCullen I</u> cannot control because it did not specifically conclude whether the Act is substantially overbroad at the Boston, Worcester, and Springfield locations. Withal, they offer no accompanying factual allegations, other than pointing to what they identify as five buffer zones at the Springfield location. As we already have explained, <u>see</u> <u>supra</u> Part I(B)(3), only two enforceable buffer zones exist around the Springfield clinic. Thus, our Springfield-directed analysis considers only those two zones.

We need not tarry. Here, as in <u>Hill</u>, "the comprehensiveness of the statute is a virtue, not a vice, because it is evidence against there being a discriminatory governmental motive." 530 U.S. at 731. The plaintiffs have not pleaded facts sufficient to suggest that our earlier holding in <u>McCullen I</u> does not control their present claim. Accordingly, the claim fails under the plausibility standard. It follows that the district court did not err in granting judgment on the pleadings on the overbreadth claim.

## C. **Other Claims**.

The plaintiffs attempt to resurrect a number of other claims that the district court laid to rest in its entry of judgment on the pleadings. <u>See</u> <u>McCullen II</u>, 759 F. Supp. 2d at 143-45. There are two principal problems.

First, the plaintiffs have not pleaded an adequate factual predicate.  In the absence of pleaded facts sufficient to distinguish the plaintiffs' as-applied challenge on these grounds from their failed facial challenge, the latter controls the former. See McGuire II, 386 F.3d at 61-62; Repub. Nat'l Comm. v. FEC, 698 F. Supp. 2d 150, 157 (D.D.C.), aff'd mem., 130 S. Ct. 3544 (2010).

Second, the plaintiffs do not pursue this battery of claims with developed argumentation or in any other meaningful way. We routinely have held, and today reaffirm, that theories presented on appeal in a perfunctory fashion are deemed abandoned.  See, e.g., Ahmed v. Holder, 611 F.3d 90, 98 (1st Cir. 2010); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).  So it is here.

## IV.  THE AS-APPLIED CHALLENGE

We turn next to the red meat of this appeal: the plaintiffs' as-applied challenge to the operation of the Act at the three specific RHCFs described above.  The district court spurned this challenge; it concluded that because there are adequate alternative channels of communication open to the plaintiffs at each location, the Act comprises a valid time-place-manner regulation.  McCullen III, 844 F. Supp. 2d at 225.  We review this conclusion de novo.  See Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 508 n.27 (1984); Sullivan v. City of Augusta, 511 F.3d 16, 24-25 (1st Cir. 2007).

With respect to time-place-manner regulations, the Supreme Court has explained:

> [E]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.

Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (internal quotation marks omitted); see Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8, 12 (1st Cir. 2004). The district court found that the issues of content neutrality and narrow tailoring were definitively resolved by McCullen I. See McCullen III, 844 F. Supp. 2d at 210; see also McCullen II, 759 F. Supp. 2d at 145. The plaintiffs lament that this approach "improperly narrowed the required constitutional analysis."

We reject this lamentation. The facts proffered by the plaintiffs in support of their as-applied challenge do not raise new or different issues but, rather, repeat in relevant part the same fact patterns envisioned in our adjudication of their failed facial challenge. See, e.g., McCullen I, 571 F.3d at 179-80. It is black-letter law that a plaintiff cannot rewardingly prosecute an as-applied challenge to the constitutionality of a statute based on the same legal arguments and factual predicate that underpinned

-24-

an earlier (unsuccessful) facial challenge.  See In re Cao, 619 F.3d 410, 430 (5th Cir. 2010); McGuire II, 386 F.3d at 61.

The congruence between the plaintiffs' facial and as-applied challenges cannot be gainsaid.  The plaintiffs now attempt to raise precisely the same arguments about content neutrality and the significance of the governmental interest involved that were squarely raised (and squarely repulsed) in the course of their facial challenge.  See McCullen I, 571 F.3d at 175-78.  The same can be said of the narrow tailoring inquiry.  See id. at 178-80.  In any event, to the extent that the as-applied challenge in this case implicates particularities of the three clinic locations, those particularities are swept into — and appropriately addressed by — the inquiry into the availability of adequate alternative means of communication.  See, e.g., Hill, 530 U.S. at 725-30 (blending these two analyses).

This brings us to the pivotal question of whether the Act, as applied, leaves open adequate alternative means of communication.  Each of the plaintiffs engages in communicative activities outside one of the three designated RHCFs.  According to the plaintiffs, these communicative activities are intended to influence individuals seeking or considering abortions as well as "those who approve or perform abortions."

The plaintiffs vouchsafe that they prefer to communicate their message through up-close, gentle conversations, accompanied

by smiles and eye contact. They insist that the buffer zones authorized by the Act force them to engage in shorter, louder, and less personal exchanges. They fear that, without the ability to "make eye contact and demonstrate a caring demeanor," their communications are ineffectual. As they see it, the need to stop at the edge of the buffer zone is devastating; this restriction compels them to raise their voices, precludes them from handing literature to prospective patients in many instances, detracts from their message, and somehow makes them seem "untrustworthy."

Notwithstanding the plaintiffs' importunings, the court below concluded that adequate alternative means of communication exist at all three sites. See McCullen III, 844 F. Supp. 2d at 225. Our inquiry focuses on this set of conclusions.

The record makes plain that communicative activities flourish at all three places. To begin, the plaintiffs and their placards are visible to their intended audience. Through their signs and demonstrations, the plaintiffs disseminate their message and elicit audience reactions. Their voices are audible. They have the option (which they sometimes have exercised) of using sound amplification equipment. When they and their cohorts deem it useful to do so, they congregate in groups outside a clinic, engage in spoken prayer, employ symbols (such as crucifixes and baby caskets), and wear evocative garments. They sometimes don costumes (dressing up as, say, the Grim Reaper).

To be sure, the Act curtails the plaintiffs' ability to carry on gentle discussions with prospective patients at a conversational distance, embellished with eye contact and smiles. But as long as a speaker has an opportunity to reach her intended audience, the Constitution does not ensure that she always will be able to employ her preferred method of communication. See McCullen I, 571 F.3d at 180 (explaining that "the Constitution neither recognizes nor gives special protection to any particular conversational distance"); see also Marcavage v. City of New York, 689 F.3d 98, 107 (2d Cir. 2012) (explaining that alternative channels need not "be perfect substitutes" nor indulge a speaker's preference for particular modes of communication). In the last analysis, "there is no constitutional requirement that demonstrators be granted . . . particularized access" to their desired audience. Bl(a)ck Tea Soc'y, 378 F.3d at 14. As long as adequate alternative means of communication exist, the First Amendment is not infringed.

Our inquiry into the adequacy of alternative means of communication is, of course, site-specific. See, e.g., Hill, 530 U.S. at 730. At the Boston clinic, all prospective patients must traverse a public sidewalk to gain entry. Given this reality, many channels of communication remain available to the plaintiffs. Those alternative channels are adequate to offset the restrictions inherent in the buffer zones.

-27-

The analysis is somewhat different with respect to Worcester and Springfield. At these sites, it is not the buffer zones that constitute the main impediment to communicative activity; instead, it is the prospective patients' unwillingness to venture off the clinics' private property. Most prospective patients arrive by car, park in private lots, and use non-public walkways to enter the facility. The fact that these patients are not readily accessible to the plaintiffs is more a function of the physical characteristics of the sites than of the operation of the Act.

This is a critically important datum. The law does not require that a patient run a public-sidewalk gauntlet before entering an abortion clinic. That patients choose to stay on private property or not to stop their cars on approach is a matter of patient volition, not an invidious effect of the Act. First Amendment rights do not guarantee to the plaintiffs (or anyone else, for that matter) an interested, attentive, and receptive audience, available at close-range.

One additional observation seems appropriate. In the context of abortion-related demonstrations, the Supreme Court has specifically recognized the interest of clinic patients both "in avoiding unwanted communication" and "pass[ing] without obstruction." See Hill, 530 U.S. at 716-18 (internal quotation marks omitted). Consistent with this interest, the First Amendment

does not compel prospective patients seeking to enter an abortion clinic to make any special effort to expose themselves to the cacophony of political protests. See id. at 716. Nor does it guarantee to the plaintiffs the same quantum of communication that would exist in the total absence of regulation. A diminution in the amount of speech, in and of itself, does not translate into unconstitutionality. Sullivan, 511 F.3d at 44. So long as adequate alternative means of communication exist, no more is constitutionally exigible.

We add a coda. Even if the plaintiffs' audience is diminished in some respects by the existence of the buffer zones, that diminution is not constitutionally fatal. The fact that a regulation "may reduce to some degree the potential audience for [the plaintiffs'] speech is of no consequence," as long as adequate alternative means of communication exist. Ward, 491 U.S. at 802.

In an effort to change the trajectory of the debate, the plaintiffs tout the Supreme Court's decision in City of Ladue v. Gilleo, 512 U.S. 43 (1994). That decision is inapposite here.

Gilleo involved a municipal ordinance that broadly banned residential signs. Id. at 45. Analyzing the ordinance as a time-place-manner regulation, the Court assumed the validity of the city's content-neutral justification and acknowledged its valid governmental interest in limiting "visual clutter." Id. at 53-54. But the Court took account of the peculiar characteristics of home-

-29-

lawn signs and the "special respect for individual liberty in the home" and concluded that the ordinance failed to leave open adequate alternative means of communication. Id. at 56-58. Of particular pertinence for present purposes, the Court explicitly contrasted the home-lawn sign context with "the government's need to mediate among various competing uses, including expressive ones, for public streets." Id. at 58. The case at hand falls solidly within the latter context and, thus, outside Gilleo's precedential sweep.

One further point must be made. The decision in Gilleo predates the Court's abortion clinic/buffer zone line of cases. See, e.g., Hill, 530 U.S. 703; Schenck v. Pro-Choice Network of W. N.Y., 519 U.S. 357 (1997); Madsen, 512 U.S. 753. The Court's majority in these cases never even mentions Gilleo. It would make no sense to wrest Gilleo from its contextual moorings and use it as a wedge to subvert the Court's later decisions addressed to the much different problem of how the First Amendment operates when the special concerns of public-sidewalk protests around abortion clinics are at stake.

We summarize succinctly. On this record, it is readily apparent that, notwithstanding the buffer zones authorized by the Act, adequate communicative channels remain available to the plaintiffs, including oral speech of varying degrees of volume and amplification, distribution of literature, displays of signage and

symbols, wearing of evocative garments and costumes, and prayer alone and in groups.  The Act is, therefore, a valid time-place-manner regulation as applied to the Boston, Worcester, and Springfield RHCFs.

**V.   LEAVE TO AMEND**

In a last-ditch effort to save the day, the plaintiffs asseverate that the district court erred in denying them leave to amend their complaint to include a direct challenge to the Attorney General's letter.  We review for abuse of discretion a district court's denial of a motion to amend a complaint.  Hatch v. Dep't for Children, Youth & Their Families, 274 F.3d 12, 19 (1st Cir. 2001).  As a general proposition, a denial of a motion for leave to amend "will be upheld so long as the record evinces an arguably adequate basis for the court's decision," such as "futility, bad faith, undue delay, or a dilatory motive on the movant's part." Id.

The order challenged in this case falls within the rubric of undue delay.  The district court took a balanced approach.  It allowed the plaintiffs to make amendments at the margins of their complaint (for example, the addition of the three district attorney defendants, see supra note 1), but it refused to allow the plaintiffs to introduce a new theme at so late a date.

The plaintiffs' original complaint focused exclusively on the Act. The Attorney General issued the guidance letter within two

weeks of the filing of the complaint, yet the plaintiffs chose to ignore it.[6] Not until September 17, 2010 did the plaintiffs seek to enlarge their target to include the Attorney General's letter. That was more than two-and-one-half years after the docketing of their original complaint. They have offered no compelling explanation for the delay. Given the passage of this inordinate period of time, we cannot say that the district court abused its discretion in drawing the line and refusing to allow the plaintiffs to refocus their attack. See, e.g., Villanueva v. United States, 662 F.3d 124, 127 (1st Cir. 2011) (per curiam); Kay v. N.H. Dem. Party, 821 F.2d 31, 34 (1st Cir. 1987) (per curiam). The plaintiffs had ample time to get their ducks in a row, and the district court was under no obligation to give them more.

## VI. CONCLUSION

We need go no further. For the reasons elucidated above, we affirm the judgment of the district court.

**Affirmed**.

---

[6] This course of conduct hardly can be deemed an oversight. After all, the McGuire family of cases contained a failed as-applied challenge to an earlier (but similar) version of the Attorney General's letter. See McGuire II, 386 F.3d at 48, 52, 64.