# United States Court of Appeals
## For the First Circuit

Nos. 13-1605
    13-1718
    13-1719

WATCHTOWER BIBLE AND TRACT SOCIETY
OF NEW YORK, INC. ET AL.,

Plaintiffs, Appellants/
Cross-Appellees,

v.

MUNICIPALITY OF SAN JUAN ET AL.,

Defendants, Appellees/
Cross-Appellants,

ALEJANDRO GARCÍA PADILLA,
IN HIS OFFICIAL CAPACITY AS GOVERNOR, ET AL.,

Defendants, Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Gustavo A. Gelpí, U.S. District Judge]

Before

Lynch, Chief Judge,
Ripple[*] and Selya, Circuit Judges.

Paul D. Polidoro, with whom Gregory Allen and Nora Vargas

---

[*]Of the Seventh Circuit, sitting by designation

Acosta were on brief, for plaintiffs.

Rosa María Cruz-Niemiec, with whom Cruz Niemiec & Vázquez was on brief, for defendant Municipality of San Juan.

Michael C. McCall, with whom Luis Pabón Roca, Clarisa Solá Gómez, Claudio Aliff-Ortiz, Ivan Pasarell-Jove, Rafael E. Rivera-Sánchez, Pedro R. Vázquez, III, Edgar Hernández Sánchez, Robert Millán, The Law Offices of Michael Craig McCall, Faccio & Pabón Roca, Aldarondo & Lopez Bras, P.S.C., Pedro R. Vázquez Law Office, Cancio, Nadal, Rivera & Díaz, P.S.C., and Millan Law Offices were on various briefs, for remaining seven municipal defendants.

Susana I. Peñagarícano-Brown, Assistant Solicitor General, Department of Justice, with whom Margarita L. Mercado-Echegaray, Solicitor General, was on brief, for Commonwealth defendants.

November 20, 2014

**SELYA, Circuit Judge.** Unlike other jurisdictions, Puerto Rico allows private citizens to maintain gated residential communities that incorporate public streets. This unorthodox configuration produces an awkward amalgam of the public and private sectors, which makes the task of applying traditional First Amendment jurisprudence something of an adventure. A predictable result is the sort of dissonance that is apparent here.

This ten-year-old litigation is no stranger to this court. See Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Sagardía De Jesús (Watchtower I), 634 F.3d 3 (1st Cir.), reh'g denied, 638 F.3d 81 (1st Cir. 2011); Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Colombani (Watchtower II), 712 F.3d 6 (1st Cir. 2013). It traces its roots to the desire of the Jehovah's Witnesses to access public streets within gated communities in order to spread their religious message. This desire puts their legitimate First Amendment rights on a collision course with Puerto Rico's decision to allow residents to protect themselves against violent crimes by establishing gated communities that incorporate public streets. Seeking to avoid this collision and paying heed to our prior opinions in this litigation, the court below carefully balanced competing concerns and devised a practical solution. That solution satisfied no one, and both the Jehovah's Witnesses and the

affected municipalities appeal.[1]  After careful consideration, we uphold the district court's solution but modify it in some aspects and remand the case for further proceedings consistent with this opinion.

## I.  BACKGROUND

This case has a twisted procedural history.  We assume the reader's familiarity with our earlier opinions and rehearse here only those events necessary to place the pending appeals into perspective.

In response to an epidemic of violent crimes, the Commonwealth enacted the Controlled Access Law (CAL), P.R. Laws Ann. tit. 23, §§ 64-64h, which allows municipalities to authorize neighborhood associations to erect gates enclosing public streets.  See Watchtower I, 634 F.3d at 6-7; see also P.R. Laws Ann. tit. 23, § 64.  These gated communities are called "urbanizations."

Even though the CAL and its regulations set a framework for administration of the controlled access scheme, the permitting process is in the hands of the municipalities.  They may adopt rules "needed to carry out the purposes of" the CAL.  P.R. Laws Ann. tit. 23, § 64e; see Asoc. Pro Control de Acceso Calle Maracaibo, Inc. v. Cardona Rodriquez (Maracaibo), 144 D.P.R. 1, 26 (P.R. 1997) (explaining that municipalities have "the authority to

---

[1] Various officials of the Commonwealth of Puerto Rico (collectively, the Commonwealth defendants) were provisionally dismissed as defendants and appear here as appellees.

define the system to be used and to establish the pertinent and appropriate requisites" for each proposed urbanization). A permit may not be revoked once it is recorded, but a municipality may impose sanctions for violations of applicable rules and regulations. See P.R. Laws Ann. tit. 23, § 64d.

In 2004, two corporations operated by the governing body of the Jehovah's Witnesses brought suit against the Commonwealth defendants under 42 U.S.C. § 1983. Their complaint alleged that the CAL, on its face and as administered, unconstitutionally infringed the Jehovah's Witnesses' right to engage in door-to-door ministry. In support, they asserted that access to certain urbanizations was routinely denied by security guards and that unmanned gates, accessible solely by resident-controlled keys or buzzers, were effectively impenetrable to nonresidents.

The Commonwealth defendants moved to dismiss the complaint. The district court granted the motion as to the plaintiffs' facial challenge to the CAL but declined to address the as-applied challenge in the absence of a developed record. Shortly thereafter, the court directed the plaintiffs to file an amended complaint "includ[ing] as defendants the specific communities which will be affected by any decision of this Court." The plaintiffs elected to sue only a "representative" sampling of municipalities.[2]

_____

[2] The plaintiffs joined a smattering of urbanizations as additional defendants. No urbanization remains an active party.

-5-

After discovery, the parties cross-moved for summary judgment on the as-applied claims. The district court granted the defendants' motions, see Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Sánchez-Ramos, 647 F. Supp. 2d 103, 125-26 (D.P.R. 2009), and the plaintiffs appealed. We affirmed the dismissal of the plaintiffs' facial challenge but vacated the judgment on the as-applied claims and remanded for further proceedings. See Watchtower I, 634 F.3d at 17.

With respect to manned urbanizations, we exhorted the district court to "take prompt action" to ensure that guards provide access to Jehovah's Witnesses who identify themselves and state their purpose. Id. We noted that unmanned urbanizations by their very nature gave "residents a veto right over access," and stated:

> A regime of locked, unmanned gates completely barring access to public streets will preclude all direct communicative activity by non-residents in traditional public forums, and, absent a more specific showing, cannot be deemed "narrowly tailored." Thus, a manned guard gate for each urbanization is required, unless the urbanization carries a burden of special justification.

Id. at 13. While recognizing that remediation could not be accomplished overnight, we assumed that some unmanned urbanizations might hire and train guards, whereas others that sought "to justify more limited access arrangements (for example, manned gates for limited periods on designated days) or an exemption because of

-6-

small size" would "need[] a chance to propose and defend such a request." Id. at 17. In denying rehearing, we clarified that we had made no finding of liability on the part of any of the defendants and explained that "any municipality or urbanization is free on remand to urge that it did not improperly bar access or discriminate." Watchtower Bible & Tract Soc'y, 638 F.3d at 83.

The district court conducted a further hearing and, on February 1, 2012, issued an order responding to our decision. It directed each municipal defendant to certify within two months that all manned urbanizations within its borders had been instructed to provide immediate access to Jehovah's Witnesses who disclose their purpose and identity. In addition, it gave the municipalities time to prepare and submit action plans tailored to the unmanned urbanizations in their respective jurisdictions. Finally, the court ordered that, going forward, municipalities should not issue permits for new unmanned urbanizations absent some special justification.

At the same time, the court dismissed the Commonwealth defendants sua sponte. When objections ensued, the district court requested briefing on the issue. After considering the parties' submissions, the court reaffirmed the dismissal of the Commonwealth defendants. The plaintiffs attempted to take an immediate appeal from this ruling. We dismissed that appeal for want of appellate jurisdiction. See Watchtower II, 712 F.3d at 13.

The case meandered in the district court for over a year. Eventually, the court entered a final judgment as to unmanned urbanizations. The core element of the court's remedial scheme was a directive that each municipal defendant furnish the plaintiffs with "unfettered" access (twenty-four hours a day, seven days a week) to every unmanned urbanization within its borders. To accomplish this objective, the municipalities were ordered to gather and turn over to the plaintiffs all means of access available to residents of unmanned urbanizations (such as keys, buzzers, or access codes). The municipalities were given a relatively short time frame within which to collect the means of access and were warned that sanctions would be imposed for delays. The obligation was ongoing: if an urbanization changed its means of access (say, by converting to a new key system or a modified access code), the municipalities were obliged to turn over such new means of access within twenty-four hours.[3] The court retained jurisdiction for enforcement purposes.

The municipal defendants moved unsuccessfully for reconsideration. Even before the appeal period expired, several municipalities offered reasons why certain urbanizations should be exempted from turning over means of access (for example, some

---

[3] Citing our decision in Watchtower I, the district court, in paragraph 6 of its judgment, also directed each municipal defendant to evaluate whether unmanned urbanizations in its jurisdiction had any "special justification" for not converting to manned gates.

urbanizations left pedestrian gates open twenty-four hours a day). The district court brushed these reasons aside, telling the affected municipalities that, if any resistence developed, they should forcibly lock the unmanned gates in the open position. Sanctions were subsequently levied against noncompliant municipalities.

In due season, the plaintiffs and the municipal defendants appealed. We consolidated these appeals for briefing and argument.

## II. ANALYSIS

The centerpiece of the district court's remedial scheme with respect to unmanned urbanizations is a mandatory injunction directed at the municipal defendants. When a party appeals from the issuance of an injunction, appellate review is for abuse of discretion. See Shell Co. (P.R.) v. Los Frailes Serv. Station, Inc., 605 F.3d 10, 19 (1st Cir. 2010); K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 915 (1st Cir. 1989). Within this rubric, conclusions of law are assayed de novo and findings of fact are assayed for clear error. See Bl(a)ck Tea Soc'y v. City of Bos., 378 F.3d 8, 11 (1st Cir. 2004). Judgment calls, including the lower court's choice of equitable remedies, are afforded substantial deference and will be disturbed only if the court has made a significantly mistaken judgment. See Rosario-Torres v. Hernández-Colón, 889 F.2d 314, 323 (1st Cir. 1989) (en banc).

These appeals raise a cacophony of issues. We start with a threshold matter: the municipalities' contention that the plaintiffs' claims are moot. Finding this contention meritless, we proceed to examine the parties' other assignments of error.

### A. Mootness.

The municipalities' argument for mootness hinges on the fact that the district court's judgment is favorable to the plaintiffs. But even though the plaintiffs obtained some relief, they retain a right to appeal the scope and reach of the remedy granted. See Forney v. Apfel, 524 U.S. 266, 271 (1998). That the municipal defendants have complied with the district court's remedial order does not diminish this right. See Vitek v. Jones, 445 U.S. 480, 487 (1980); see also N.Y. State Nat'l Org. for Women v. Terry, 159 F.3d 86, 92 (2d Cir. 1998) ("[V]oluntary cessation of misconduct does not engender mootness where the cessation resulted from a coercive order and a threat of sanctions."). Accordingly, we hold that the plaintiffs' claims are not moot.

### B. Propriety of Injunctive Relief.

The municipalities assert that the district court erred in granting injunctive relief in the absence of a supportable finding that they violated the plaintiffs' constitutional rights. Relatedly, they assert that the injunction must be rescinded due to the absence of factual findings.

The first assertion is built on the notion that courts lack authority to impose a remedy against a defendant who has not been shown to be a wrongdoer. See, e.g., Rizzo v. Goode, 423 U.S. 362, 377 (1976); Milliken v. Bradley, 418 U.S. 717, 745 (1974). The municipalities say that the district court made no finding that they (as opposed to the urbanizations) were responsible for infringing the plaintiffs' First Amendment rights.

Although the district court made no explicit statement that the municipalities had violated the plaintiffs' First Amendment rights, we think such a determination is implicit in the court's findings, viewed as a whole. In its February 2012 order, the district court found that "in every Municipality there currently exist . . . urbanizations with unmanned gates, where access is through a locked gate or buzzer operated solely by residents." This is precisely the type of access regime that we deemed unconstitutional in Watchtower I, 634 F.3d at 13. The district court went on to find that "by virtue of the [CAL], it is the Municipalities that approve urbanizations' requests for any type of controlled access." These findings dovetail with the court's earlier finding that the grant of a permit to an urbanization "does not abrogate the municipality's obligation to ensure that public streets remain available for public use." Watchtower Bible & Tract Soc'y, 647 F. Supp. 2d at 109.

We review for clear error a district court's factual findings. See Fed. R. Civ. P. 52(a)(6); AIDS Action Comm. of Mass., Inc. v. MBTA, 42 F.3d 1, 7 (1st Cir. 1994). The aggregate findings here, explicit and implicit, confirm that the municipal defendants have had a custom and practice of issuing permits to unmanned urbanizations without ensuring that the public streets within them are open to protected speech activities. These findings are supported by the evidence and, therefore, are not clearly erroneous. Moreover, they are adequate to undergird a grant of injunctive relief. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).

Almost as an afterthought, the municipal defendants question the district court's factual finding that every defendant municipality hosted one or more unmanned urbanizations. This is much ado about very little: even if the record may have been hazy at the time, subsequent proceedings have made the accuracy of the finding abundantly clear. Consequently, remanding for further inquiry into this point would be an empty ritual. See Aoude v. Mobil Oil Corp., 862 F.2d 890, 895 (1st Cir. 1988) (citing Gibbs v. Buck, 307 U.S. 66, 78 (1939)).

This brings us to the underlying legal question, which engenders de novo review. See AIDS Action Comm., 42 F.3d at 7. We agree with the court below that legal responsibility for the plaintiffs' injury may be placed on those host municipalities that

-12-

issued permits authorizing unmanned urbanizations with no reliable means of public access.  More than a decade before this litigation began, the Puerto Rico Supreme Court declared that a municipality, in its capacity as the permitting authority under the CAL, must "carefully examine the access control proposal submitted for its approval."  Caquías Mendoza v. Asoc. de Residentes de Mansiones de Río Piedras, 134 D.P.R. 181, P.R. Offic. Trans. at 14 (P.R. 1993).  The municipality's responsibility extends to an examination of "the manner in which the applicant entity plans to operate" the proposed urbanization.  Id.  The purpose of such an inquiry is to ensure that any proposed access plan "does not infringe on the rights conferred by our legal system to all the parties affected by it."  Id. at 15.  In a later case, the same court explained that municipalities must set "specific criteria to guide the [urbanizations] with respect to how to control the access."  Maracaibo, 144 D.P.R. at 26.  In other words, municipalities have "the authority to define the system to be used and to establish the pertinent and appropriate requisites for each [urbanization]."  Id.

We think it follows that, in administering the CAL, each municipality has an ongoing duty to ensure that the First Amendment is respected in the urbanizations founded under its auspices.  In addition, the legislature has implanted teeth in this grant of authority:  the CAL gives municipalities the power to impose

-13-

sanctions on a wayward urbanization even after a permit is issued and recorded. See P.R. Laws Ann. tit. 23, § 64d.

The municipalities try to take cover under the rule that cities cannot be held liable for third-party constitutional violations. See Monell, 436 U.S. at 691. Their premise is correct. This is a section 1983 suit, and — deliberate indifference aside[4] — a municipality is subject to liability under section 1983 only if a deprivation of rights is effected pursuant to a municipal policy or custom. See L.A. Cnty. v. Humphries, 131 S. Ct. 447, 449 (2010) (applying Monell to equitable claims). But the conclusion that the municipal defendants draw from this premise is faulty. As we made clear in Watchtower I, "[a]uthorization of controlled access is on its face an implementation of municipal policy." 634 F.3d at 9. Here, the record amply demonstrates that the municipal defendants have had a policy and custom of issuing permits to urbanizations without attaching conditions sufficient to ensure public access. This policy and custom led directly to the infringement of the plaintiffs' First Amendment rights. No more is exigible to warrant equitable relief against the municipal defendants.

_____

[4] In a section 1983 case against a municipality, a finding of liability might also be based on deliberate indifference to an obvious risk of a constitutional violation. See City of Canton v. Harris, 489 U.S. 378, 390 (1989). While we note this possibility for the sake of completeness, we need not explore it here.

The municipal defendants have a fallback position. They argue that the injunction must be vacated because the district court failed sufficiently to explain the reasons for issuing it and, thus, violated Federal Rule of Civil Procedure 65(d)(1)(A). We do not agree.

Rule 65(d)(1)(A) provides that every injunction must "state the reasons why it issued." The district court's orders, read in conjunction with the hearing transcripts, chronicle the court's laudable effort to balance the parties' and the public's competing interests — free speech versus personal security — while avoiding the imposition of undue administrative and financial burdens on municipalities and urbanizations. Those sources combine adequately to apprise the parties of the reasons for the injunction and supply a satisfactory basis for meaningful appellate review. Rule 65(d)(1)(A) must be given a commonsense construction, not a hypertechnical one. See Withrow v. Larkin, 421 U.S. 35, 45 (1975); Global NAPs, Inc. v. Verizon New Eng., Inc., 706 F.3d 8, 15 (1st Cir. 2013) (per curiam). While a more elaborate statement of the court's rationale would have been helpful here, it is enough that the court made the essence of its reasoning plain before ordering injunctive relief. See Global NAPs, 706 F.3d at 15.

### C. The Watchtower I Mandate.

We turn now to the argument that the district court violated the mandate rule in crafting equitable relief. In its

-15-

pertinent iteration, the mandate rule, a branch of the law of the case doctrine, prevents relitigation in the lower court of issues already decided on an earlier appeal of the same case.  See Mun'y of San Juan v. Rullan, 318 F.3d 26, 29 (1st Cir. 2003).  We review de novo whether and to what extent the mandate rule applies.  See Negrón-Almeda v. Santiago, 579 F.3d 45, 50 (1st Cir. 2009).

Although both sides suggest that the district court's remedial scheme for unmanned urbanizations flouts the mandate in Watchtower I, they offer disparate reasons for their suggestion. From the plaintiffs' standpoint, the putative mandate violation rests on our statement that "a manned guard gate for each urbanization is required, unless the urbanization carries a burden of special justification."  Watchtower I, 634 F.3d at 13.  The plaintiffs posit that the district court ignored this statement and improvidently allowed unmanned urbanizations to forgo hiring guards without first justifying their entitlement to an exception.  The municipalities come at the putative mandate rule violation from a different direction.  Relying on our statement that "[t]he district court will have to determine whether and when it is reasonable to rely only on a buzzer system or some limited guard access," id., they posit that the district court should have considered each urbanization singly instead of imposing a global solution.

We readily admit that our opinion in Watchtower I created some ambiguity as to the scope of discretion available to the

-16-

district court.  We did not intend to lay down rigid rules but, rather, meant to highlight that the district court must take some remedial action to resolve the unique constitutional problems presented by unmanned urbanizations.  And in all events, what we said about specific remedies was not part of our mandate.

The scope of an appellate mandate is restricted by the issues that were actually before the appellate court.  See Biggins v. Hazen Paper Co., 111 F.3d 205, 209 (1st Cir. 1997) ("Broadly speaking, mandates require respect for what the higher court decided, not for what it did not decide.").  The issue in Watchtower I was whether the district court erred in dismissing any or all of the plaintiffs' claims.  See 634 F.3d at 8.  Issues of remediation were not before the Watchtower I court and, thus, the nature and extent of any particular remedy was not within the scope of our mandate.  See Amado v. Microsoft Corp., 517 F.3d 1353, 1360 (Fed. Cir. 2008).

That ends this aspect of the matter.  We intended neither to bind the district court to a presumption that unmanned urbanizations should hire guards nor to preclude the use of a global solution to the problems presented by unmanned urbanizations.  Accordingly, we reject the parties' mandate rule

arguments[5] and proceed to evaluate the district court's remedial scheme on the merits.

### D. **The Merits.**

The abuse of discretion standard applies to review of the district court's choice of a particular equitable remedy. See Rosario-Torres, 889 F.2d at 323. This standard is highly deferential. See id.

There can be no doubt that the First Amendment protects access to traditional public forums, including public streets, for the purpose of engaging in door-to-door ministry. See Watchtower I, 634 F.3d at 10. It is against this backdrop that the plaintiffs complain that the district court's remedial scheme unconstitutionally restricts their expressive activities. However, their complaint must take into account that the prophylaxis of the First Amendment is not unbounded. Reasonable time, place, and manner restrictions are permissible. See Pleasant Grove City v. Summum, 555 U.S. 460, 469 (2009). Such restrictions will be upheld so long as they are content-neutral, narrowly tailored to serve a significant governmental interest, and leave adequate alternative

---

[5] The district court, like the parties, treated our statements about relief as binding. See supra note 3. Consistent with the clarification that we make today, we direct the district court, on remand, to strike paragraph 6 of its March 2013 judgment. To the extent that the district court finds that the terms of paragraph 6 are justified without regard to our mandate, it is free upon remand to modify the injunction to reintroduce a requirement that unmanned urbanizations show special justification for failing to convert to a manned gate.

-18-

channels of communication open to the speaker.  See Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989).

The remedy crafted by the district court passes muster under this paradigm.  We assume, as do the parties, that the minimal restrictions imposed on plaintiff's speech "are justified without reference to [its] content."  Ward, 491 U.S. at 791 (quoting Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984)) (internal quotation mark omitted).  To the extent that the remedial scheme conditions access to the urbanizations on the content of the plaintiffs' speech, that is a condition consistent with the right of access that the plaintiffs claim.

Similarly, the remedial scheme opens the very channel of communication that the plaintiffs seek to pursue.  Moreover, it is narrowly tailored to strike a balance between the plaintiffs' significant interest in accessing public streets to carry out their ministry and the government's significant interest in the security of residents.  As we explained in Watchtower I, the CAL "was prompted by and adopted against a background of endemic violent crime," including drug dealing and an unusually high homicide rate. 634 F.3d at 6.  These security concerns weigh heavily in the First Amendment analysis.

Even though the plaintiffs lament that sharing a single key among their adherents will create logistical problems and inhibit spontaneous speech, this lament overstates the matter.  The

-19-

district court, faced with a difficult quandary, devised a practical solution. While the court's solution entails sharing a key among persons having a common mission, that requirement is not especially onerous, and the resulting burden on the plaintiffs' speech is minimal.

At any rate, this minimal burden is offset to some extent by benefits inherent in the remedial scheme. The injunction entitles the plaintiffs to round-the-clock access to unmanned urbanizations, on a level equal to that of residents. This quantum of access exceeds the constitutional minimum. Cf. Bl(a)ck Tea Soc'y, 378 F.3d at 13-14 (upholding substantial limitations on use of public streets and sidewalks near political convention). Indeed, it is hard to imagine a less speech-restrictive alternative that would still effectively serve the government's interest in residential security.

The plaintiffs also challenge the geographic breadth of the injunction. The remedy, they say, is not island-wide and, thus, does not provide them with access to every unmanned urbanization in Puerto Rico. This shortfall, however, is of the plaintiffs' own contrivance: it was their decision to sue only a representative sampling of municipalities that authorized unmanned urbanizations. Had they accepted the district court's invitation and sued all of the affected municipalities, the geographic breadth of the remedy would not be an issue.

The plaintiffs try to characterize the need to file additional lawsuits against other municipalities as a prior restraint. This characterization is fanciful. In the First Amendment context, a prior restraint is a restraint imposed by the government. See, e.g., Neb. Press Ass'n v. Stuart, 427 U.S. 539, 543-44 (1976); Shuttlesworth v. City of Birmingham, 394 U.S. 147, 156 (1969). The harm of which the plaintiffs now complain is not the result of a prior restraint imposed by a court or government agency but, rather, results from the plaintiffs' considered choice to sue fewer than all the host municipalities.

By the same token, we reject the plaintiffs' argument that the burden of sharing keys constitutes a prior restraint. Sharing keys is a reasonable restriction on the manner of affording access to public streets within the urbanizations. As such, it is no more a prior restraint than the regime for which the plaintiffs advocate on appeal: requiring an individual to stop at a sentry booth, identify herself to a guard, and state the purpose of her planned entry. See Watchtower I, 634 F.3d at 13-14 (concluding that manned-gate arrangement would pass constitutional muster).

Like the plaintiffs, the municipal defendants challenge the merits of the district court's remedial scheme. Their challenge can be distilled to a claim that the injunction imposes undue administrative burdens upon municipalities (for example, collecting and distributing keys and keeping track of changes in

-21-

modes of access). This challenge is for the most part easily rebuffed.

A hallmark of equity is the broad flexibility that is available to the chancellor in the fashioning of remedies. <u>See</u> <u>Hecht Co.</u> v. <u>Bowles</u>, 321 U.S. 321, 329-30 (1944). Here, the record makes manifest that the remedial scheme is not so burdensome as to constitute an abuse of discretion. Presented with evidence that conversion to manned gates would be prohibitively expensive for many unmanned urbanizations, the district court crafted a less-costly anodyne that provides the plaintiffs with nearly unfettered access to such urbanizations.

While this anodyne requires some administration by municipalities, those added duties are not significantly vexatious. After all, it is the CAL, not the district court, which placed the municipalities at the helm of the permitting process. <u>See</u> P.R. Laws Ann. tit. 23, §§ 64, 64b. Given this legislative judgment, we think that the district court acted well within its discretion in adding a modest incremental burden to the municipalities' administrative role. <u>See</u> <u>Rosario-Torres</u>, 889 F.2d at 323 (explaining that "the trial judge, who has had first-hand exposure to the litigants and the evidence, is in a considerably better position to bring the scales into balance than an appellate tribunal").

There is, however, a small exception to this analysis. The last sentence of paragraph four of the March 2013 judgment requires municipalities to deliver any new means of access to the plaintiffs within twenty-four hours of any change. This condition would impose an unfair burden on municipalities if, for example, the means of access are changed on a weekend when municipal offices are closed. Accordingly, we vacate this portion ("within twenty-four hours of the change") of the district court's remedial order. The court is free on remand to impose a less burdensome rule with a similar goal, such as a requirement that municipalities deliver the new means of access to the plaintiffs on the next business day.

### E. Dismissal of Commonwealth Defendants.

Next, the plaintiffs assail the district court's sua sponte dismissal of the Commonwealth defendants. Had the court kept those defendants in the case, the plaintiffs say, it would have been able to fashion a more salubrious island-wide remedy.

Sua sponte dismissals, which by definition are entered on the court's own initiative and without advance notice or an opportunity to be heard, are disfavored. See González-González v. United States, 257 F.3d 31, 36-37 (1st Cir. 2001); Berkovitz v. Home Box Office, Inc., 89 F.3d 24, 31 (1st Cir. 1996). Nevertheless, a sua sponte dismissal will not be set aside where the aggrieved party cannot show any prejudice. See Vives v. Fajardo, 472 F.3d 19, 22 (1st Cir. 2007).

In this instance, the plaintiffs cannot show a smidgen of prejudice. When the sua sponte dismissal was questioned, the district court prudently invited briefing on the underlying issues and reconsidered its action. The entry of a new order of dismissal after reconsideration effectively cured any prejudice. See Curley v. Perry, 246 F.3d 1278, 1284 (10th Cir. 2001); Winters v. Diamond Shamrock Chem. Co., 149 F.3d 387, 402 (5th Cir. 1998).

Our holding that the order of dismissal is not subject to reversal on procedural grounds does not end the inquiry. The plaintiffs submit that there was no valid basis for the dismissal of the Commonwealth defendants. In their view, the Commonwealth's participation in a remedial scheme is necessary to afford complete relief. This amounts to a claim that the Commonwealth defendants are required parties. See Fed. R. Civ. P. 19(a)(1)(A).

We reject the plaintiffs' importunings. A party is a necessary party within the purview of Rule 19(a)(1)(A) only if, "in that person's absence, the court cannot accord complete relief among existing parties." Relief is complete when it meaningfully resolves the contested matter as between the affected parties. See Fed. R. Civ. P. 19 advisory committee note to 1966 amend.; Alto v. Black, 738 F.3d 1111, 1126 (9th Cir. 2013). To be complete, however, the relief need not align exactly with the remedy sought by the plaintiff. See Salt Lake Tribune Publ'g Co. v. AT&T Corp., 320 F.3d 1081, 1097 (10th Cir. 2003). As long as a party's absence

-24-

does not prevent the district court from affording complete relief, Rule 19(a)(1)(A) does not mandate that party's continuing presence.[6] See Bacardí Int'l Ltd. v. V. Suárez & Co., 719 F.3d 1, 10 (1st Cir.), cert. denied, 134 S. Ct. 640 (2013).

In this case, we detect no error in the district court's conclusion that complete relief as between the main protagonists — the plaintiffs and the municipalities — can be accomplished without the involvement of the Commonwealth defendants. See Williams v. Fanning, 332 U.S. 490, 494 (1947) (holding that absent party is not indispensable if relief-granting decree is effective without requiring that party "to do a single thing"). The court's remedial scheme redresses the constitutional violations in the communities that the plaintiffs joined in their suit, and no action by the Commonwealth is needed for the municipal defendants to implement that remedy. Surely, the presence of the Commonwealth defendants is not required in order for the municipal defendants to, say, collect and distribute keys, monitor compliance, and sanction offenders.

Of course, the fact that an otherwise proper defendant is not a necessary party does not mean that it must be dismissed from the case. But where, as here, certain defendants are dispensable parties whose presence is not required to afford complete relief,

---

[6] The plaintiffs' assignment of error implicates only Rule 19(a)(1)(A). They do not contend that the Commonwealth defendants are required parties under Rule 19(a)(1)(B).

the trial court may, in the exercise of its sound discretion, dismiss them. See Comm. for Pub. Educ. & Religious Liberty v. Rockefeller, 322 F. Supp. 678, 686 (S.D.N.Y. 1971) (citing Fed. R. Civ. P. 21). So viewed, the issue reduces to whether the district court's decision to fashion a remedial scheme that does not involve the Commonwealth defendants is an abuse of discretion. We think not.

Faced with the need to remedy ongoing constitutional violations, the district court reasonably could have chosen to ameliorate those violations by a decree addressed either to the municipalities or to the Commonwealth defendants. There are advantages and disadvantages to either alternative. Given this choice, we believe that the district court acted within its discretion in selecting the municipalities as the medium for effectuating relief. Once this selection was made, the Commonwealth defendants became superfluous. And while the ensuing implementation of the remedial scheme has had its challenges, those challenges cannot fairly be attributed to the absence of the Commonwealth defendants. Indeed, the Commonwealth defendants have assured us, both at oral argument and in a letter submitted pursuant to Federal Rule of Appellate Procedure 28(j), that the

Puerto Rico police are aware of the constitutional rights of the plaintiffs and are under orders to assist them.[7]

In any event, the district court wisely left open the possibility of future participation in the case by the Commonwealth defendants. See Watchtower II, 712 F.3d at 12-13. As a practical matter, the dismissal of the Commonwealth defendants operated without prejudice. If the district court, in light of unfolding events, were to conclude that it is desirable to have the Commonwealth defendants before the court in order to afford effective relief, it possesses the flexibility to take corrective action. See Amado, 517 F.2d at 1360.

## F.   A Loose End.

There is one problem that should not be left for future consideration. Up to this point, the district court has required unmanned urbanizations seeking exceptions to the remedial scheme to speak to the court through the municipal defendants. We think that the district court, not the affected municipality, is the appropriate arbiter of whether good cause exists in any given instance for an exception to the remedial scheme. If a particular urbanization believes that it can identify peculiar circumstances rendering the current remedy inequitable as applied to its

---

[7] The plaintiffs make much of three instances in which Commonwealth police allegedly failed to act following reports that Jehovah's Witnesses were denied access to manned urbanizations. This tells us nothing, however, as to the efficacy of the district court's remedial scheme vis-à-vis unmanned urbanizations.

community, it should be permitted to present such evidence to the court or to a court-appointed special master. <u>See</u> Fed. R. Civ. P. 53(a)(1)(C).

## III.  CONCLUSION

We caution that the current remedial scheme should not be regarded as immutable.  Our endorsement rests on the understanding that the district court, either directly or through a special master, will undertake periodic reviews of the scheme's operation. Experience is a good teacher, and experience with the remedial scheme may show that improvements are in order.  So, too, changing circumstances (including but not limited to technological advances that may make remedies such as "virtual guards" financially feasible) may alter the balance of hardships.  The district court is in the best position to ensure that the remedial scheme remains both equitable and effective in practice and, if not, to tweak it.[8]

We need go no further.  For the reasons elucidated above, we affirm the substance of the March 2013 injunction (but direct the vacation of paragraph 6 and the last portion of paragraph 4 thereof), affirm the district court's dismissal without prejudice of the Commonwealth defendants, and remand for further proceedings

---

[8] We note that the parties claim to have encountered some problems in implementing the remedial scheme.  We leave to the district court the task of determining whether these problems require the scheme to be modified.

consistent with this opinion.  All parties shall bear their own costs.


**So Ordered.**